WATKINS, Judge.
These consolidated actions arise from an accident that occurred June 13, 1979, when a loading machine commonly called a cher-rypicker fell from a dock that was under construction into the Mississippi River, damaging both the dock and the cherryp-icker, and necessitating the removal the cherrypicker from the Mississippi River by crane. The cherrypicker was operated by Frank Donald Allen, an employee of Emile M. Babst Company, Inc. which was a subcontractor of Raymond International, Inc., the principal contractor for construction of the dock. Babst was insured against liability by Maryland Casualty Company. The cherrypicker was owned by Nichols Construction Corporation and leased by Nichols to B. Drew Achee d/b/a/ Achee Specialty Rentals, and sublet by Achee to Babst. Nichols was insured by United States Fidelity & Guaranty Company against damage to the cherrypicker and against liability for its use.
Babst sued Nichols, USF & G, and Achee, or in the alternative Maryland, for cost of repairs to the dock and cost of removal of the cherrypicker from the Mississippi River, both of which were paid for by Babst. Nichols and USF & G in a separate suit sued Babst for damage to the cherrypicker, USF & G suing as subrogee of Nichols and Nichols suing individually under a $5000.00 deductible. Named defendant in that suit were not only Babst, but also Frank Donald Allen and Achee Specialty Rentals. Later, USF & G and Nichols also sued Grove Manufacturing Company, the manufacturer of the cherryp-icker, but these proceedings were dropped at the beginning of the trial. In the suit against Babst, Allen, and Achee, Babst and Allen answered and filed a reconventional demand against Nichols and USF & G. Further, Allen sued Nichols, USF & G and Achee for personal injuries and Babst filed a third party demand against Maryland for any sum it was forced to pay in Nichols’ and USF & G’s suit and for failure to defend Nichols’ suit. There were thus basically two suits, one brought by Babst and one by Nichols, with the associated recon-ventional demand and third party demand. The two suits were filed in separate parishes, one in East Baton Rouge Parish and one in St. James Parish, but the two suits *701 were consolidated before trial which took place in East Baton Rouge Parish.
At the trial, it was stipulated:
(1) In the event judgment was rendered in favor of Babst and against Nichols and USF & G, the amount of the judgment would be $70,103.61, plus legal interest and costs.
(2) In the event judgment was rendered in favor of Nichols and USF & G and against Babst, the amount of the judgment would be $17,159.80 in favor of USF & G and $5000.00 in favor of Nichols.
(3) In the event judgment was rendered in favor of Babst and against Maryland, the amount of the judgment would be $55,-450.67 for repairs to the dock, plus legal interest and costs. Nothing was to be paid by Maryland for the expense to Babst of removing the cherrypicker from the Mississippi River.
At the conclusion of the trial, the trial court gave oral reasons for judgment, in accordance with which judgment was rendered. Allen and Achee had taken no part in the trial, Achee being bankrupt.
The judgment rendered by the trial court awarded Babst $55,450.67 against Maryland. The trial court further denied Babst’s demand against Nichols and USF & G, and Nichols’ and USF & G’s claim against Babst, finding both Babst and Nichols to have been contributorily negligent for the fall of the cherrypicker. From this judgment, all parties to the trial appealed.
We amend and render.
CLAIMS INVOLVING NICHOLS and USF & G
Babst seeks to recover from Nichols and USF & G for cost of repairs to the dock and cost of removal of the cherrypicker from the Mississippi River. Nichols and USF & G (as subrogee to Nichols) seek to recover from Babst for cost of repairs to the cherrypicker. The trial court denied both claims, finding both Babst and Nichols to have been at fault, Nichols for furnishing a mechanically defective cherrypicker and Babst (as employer of Allen) to have been negligent in operating the cherrypicker. We agree with these findings of the trial court.
Raymond International was constructing a dock on the bank of the Mississippi River to accommodate vessels carrying energy producing liquids for the United States Department of Energy. Babst as subcontractor by written contract undertook to perform part of the work.
The dock projected into the Mississippi River. On the surface of the dock was an oil dam, an elevated part of the dock floor used to prevent the spread of waste oil. A 42” pipe ran along the edge of the dock.
The cherrypicker was positioned on the dock to lift a 42” blind flange, which was to be attached to the end of the 42” pipe. The blind flange weighed several thousand pounds. The cherrypicker had four outrigger pads, which were designed to support the weight of the cherrypicker and a lifted object when the cherrypicker was lifting a load. The cherrypicker when the outrigger pads were not extended was supported by four rubber tires.
Allen, the operator of the cherrypicker, testified that he extended these pads and lifted the blind flange from a truck by use of the boom attached to the cherrypicker. He was turning the boom in a counterclockwise direction. As the boom and load reached the 11:00 o’clock position, the load began to swing without control slowly in a still further counter-clockwise direction. Allen attempted to use the braking mechanism on the cherrypicker that was designed to halt the turning of the boom, to no avail. Finally, it became obvious the cherrypicker would topple over, and Allen jumped from the cherrypicker. The cherrypicker fell from the dock, damaging the dock, into the Mississippi River. The cherrypicker was recovered by Babst by use of a crane the next day.
Robert McKenzie, an expert who testified for Nichols, stated that two of the wheels of the cherrypicker were positioned on the top of the oil dam which extended across the surface of the dock. The outrig *702 ger pads were designed to be separately adjusted to compensate for unevenness of surface. Even with use of the adjustment, the trial court found, as McKenzie had testified, that two wheels of the cherrypicker would have been ten or eleven inches higher than the other two wheels. Thus, part of the weight of the cherrypicker would have been supported by the two wheels, rather than the outrigger pads. The manual furnished by Grove, the manufacturer, stated that to lift a load, the cherrypicker must be supported solely by the outrigger pads. Allen and hence Babst were negligent in positioning the cherryp-icker so that part of its weight would be supported by the tires rather than the outrigger pads.
The boom worked hydraulically. The cherrypicker while it was on the construction site had had numerous problems \yith its hydraulic system, and a drum of hydraulic fluid had been left at the site, presumably to replace hydraulic fluid that had leaked. Also, subsequent inspection revealed defects in the mechanism of the arm or boom, for which Nichols must be held responsible. Thus, Nichols was in part at fault.
The trial court found that had the cherrypicker been leveled, the failure of the boom would not have caused the accident. Conversely, had a part of the boom mechanism not failed, the unevenness of the cherrypicker would not have caused the accident. Hence, the trial court found both parties, Babst and Nichols, at fault. In this conclusion, we cannot say the trial court was clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), Canter v. Koehring Company, 283 So.2d 716 (La.1973).
Thus, we hold that Nichols and USF & G are not liable to Babst for cost of repairs to the dock, and Babst is not liable to Nichols and USF & G for cost of repairs to the cherrypicker.
Babst also seeks to recover from Nichols and USF & G for cost of removing the cherrypicker from the Mississippi River, under a theory of negotiorum gestio. The difficulty with this theory, which would permit one to recover for an act undertaken on behalf of another, is that Babst was in fact at fault for the toppling of the cherrypicker into the Mississippi River, as the cherrypicker was not level when the blind flange was lifted. We therefore find no error in the trial court’s denial of recovery to Babst for the cost of removing the cherrypicker from the Mississippi River.
CLAIMS INVOLVING MARYLAND
Babst seeks to recover from Maryland the sums it paid to have the dock repaired, and also statutory penalty and attorney’s fees.
As we have stated, Raymond International was principal contractor for the construction of the dock, and Babst a subcontractor. The price of subcontract entered into by Babst was $2,707,300.00. The subcontract was dated June 12, 1978. Babst was to complete its work on or before March 15, 1979. The subcontract entered into by Babst with Raymond International as principal contained the following hold harmless clause:
Should Subcontractor in any way cause delay to the progress of the work so as to cause any damage to Raymond, or any damage for which Raymond shall become liable, Subcontractor shall compensate Raymond therefor and defend and hold harmless Raymond with regard to any claim therefor.
Babst had purchased liability insurance to cover its subcontract work from Latter and Blu, New Orleans, Louisiana. The policy was issued by Maryland Casualty Company and covered Babst’s contractual liability as well as legal liability. Immediately after the accident, Harold H. Heidingsfelder, president of Babst, notified Latter and Blu, insurance agent for Maryland, of the accident. Shortly thereafter, several representatives of Maryland visited the accident site.
The accident occurred, as we have stated, on June 13, 1979. Raymond International *703 by letter instructed Babst to have the dock repaired. The repair work was to be completed on or before July 6, 1979. Babst informed Latter and Blum that time was of the essence, and that it intended to have the dock repaired immediately. Latter and Blum told Babst to proceed, that Maryland would cover the repairs.
The repairs were completed. Maryland kept in constant communication with Heid-ingsfelder, but kept delaying payment. By letter dated December 6, 1979, Babst asked Latter and Blum to have Maryland reimburse Babst for damage to the dock. Eon-aid S. James, presently regional supervisor for Maryland, testified the original of this letter was in his file. Maryland continued to indicate that payment was coming, but never paid. Finally, by letter dated April 15, 1980, Maryland denied coverage. In the meantime, Babst had paid Raymond International by deduction from the subcontract amount, and Ernst, an electrical subcontractor on the project, by check.
Maryland first contends it is not obligated to pay Babst because Babst allegedly violated a no action clause in the insurance contract. This no action clause reads as follows:
ACTION AGAINST COMPANY:
No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this policy, nor until the amount of the insured’s obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.
Thus, the no action clause generally forbids the insured to settle separately with the tort victim under pain of losing its coverage.
The no action clause has been held to be of no effect when an insurer denies coverage where there is coverage, or unjustifiably delays settlement, forcing the insured to settle separately. See Thomas W. Hooley & Sons v. Zurich General Accident and Liability Insurance Co., 235 La. 289, 103 So.2d 449 (1958). In the present case, time was of the essence, both in the performing of subcontract of Babst and in the completion of the repairs. Babst stood to lose the subcontract amount and to be held liable under the “hold harmless” clause of the subcontract entered into with Raymond International as principal if it did not complete its work timely. Yet, seemingly, it would breach the no action clause of the insurance contract with Maryland by undertaking the repairs without Maryland’s authorization. It was thus on the horns of a dilemma, from which it had seemingly extricated itself by fully cooperating with Maryland, keeping Maryland fully informed, and obtaining the assurances of Latter and Blum, insurance agents, that the claim of Babst would be covered. Maryland’s conduct in indefinitely delaying settlement when (as we shall see) the claim of Babst was clearly covered, was a breach of its duty to its insured.
We note that a First Circuit case decided after Hooley, Rosenthal v. Security Insurance Group, 205 So.2d 816 (La.App. 1st Cir.1967), enforced a no action clause where the insured settled with the tort-feasor after the insurer denied liability. However, in.that case, time was not of the essence; the claim was for a small sum, ($168.47); and there was no possibility that the insured would incur greater liability. In the present case, looming over Babst was the possibility of substantial damages under the subcontract with Raymond International.
Hence, we hold, the principles enunciated in Hooley apply, and the no action clause contained in the insurance contract cannot be applied by Maryland against Babst.
Maryland further contends, however, that the “property in the care, custody, or control” exclusion of the insurance contract applies. This clause reads as follows:
This insurance does not apply * * *
(k) to property damage to (1) property owned or occupied by or rented to the insured,
*704 (2) property used by the insured, or
(3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;
but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to property damage (other than to elevators) arising out of the use of an elevator at premises owned by, rented to or controlled by the named insured;
This clause factually does not fit the present case, as the property, the dock, was under the supervision and control of the general contractor, Raymond International, for which Babst was merely undertaking subcontract work that involved only a small part of the total contract. Also, it was necessary to obtain approval of United States government personnel to enter the premises at all. Clearly, the exclusion is without application to the present facts.
Maryland argues that it is entitled to a credit for the sum which it contends Babst is entitled to recover from Nichols as joint tortfeasor and hence co-debtor in soli-do. Maryland founds this argument on the potential claim of Babst against Nichols for contribution as a joint tortfeasor. It is noteworthy that neither Babst nor Maryland, so far as we can determine from the record, sought contribution in the trial court. In the stipulations of the parties as to the amounts the various parties were to receive in the event judgment was rendered in their favor, we note that it was stipulated that in the event judgment was rendered in favor of Babst and against Maryland, the amount of the judgment would be $55,450.67 for repairs to the dock, plus legal interest and costs. A court is bound by a judicial stipulation, which has the effect of a judicial confession as an admission between the parties. Placid Oil Co. v. A.M. Dupont Corp., 244 La. 1075, 156 So.2d 444 (1963); R.J. D’Hemecourt Petroleum, Inc. v. McNamara, 444 So.2d 600 (La.1983), cert. denied, — U.S.-, 105 S.Ct. 92, 83 L.Ed.2d 39 (1984). Thus, while contribution might have been granted in favor of Babst against Nichols were it not for this stipulation, because the stipulation has been duly entered into we cannot award judgment other than the sum required by the stipulation, by which we are bound.
Maryland, in fact, had no valid defense against the claim of Babst, its insured. The sole defense was the no action clause, which came into play solely because Maryland withheld payment of that which its contract of insurance clearly obligated it to pay. The “care, custody, and control” argument was obviously an afterthought, occurring to Maryland only in an effort to justify its withholding of payment. Hence, under the language of the penalty and attorney’s fees statute, LSA-R.S. 22:658, Maryland’s actions in withholding payment were “arbitrary, capricious, [and] without probable cause”. An insurance company cannot force its insured to go to court to obtain a proper interpretation of its own policy, Carney v. American Fire & Indemnity Co., 371 So.2d 815 (La.1979), especially when coverage cannot reasonably be denied, as in this case. The only defense Maryland really had was the no action clause. Maryland forced the no action clause to come into play because it unreasonably withheld a proper and prompt settlement of Babst’s claim. Hence, we hold that Babst is entitled to 12% penalty and attorney’s fees.
It was stipulated that attorney’s fees expended by Babst on all claims came to $23,740.41, and of that sum one-half (V2) was attributable to the liability claim against Maryland.
Therefore, judgment is rendered in favor of Emile M. Babst Co., Inc., and against Maryland Casualty Company, in the full sum of $55,450.67, together with 12% penalty, attorney’s fees in the sum of $11,-870.20, legal interest from date of judicial demand until paid, and all costs of this proceeding.
AMENDED AND RENDERED.