[No. D017054. Fourth Dist., Div. One. July 28, 1994.]

CAMELOT BY THE BAY CONDOMINIUM OWNERS' ASSOCIATION, INC., Plaintiff and Appellant, v.
SCOTTSDALE INSURANCE COMPANY, Defendant and Appellant.

**COUNSEL**

Epsten & Grinnell and Douglas W. Grinnell for Plaintiff and Appellant.

Mower, Koeller, Nebeker & Carlson, William A. Nebeker and Les W. Robertson for Defendant and Appellant.

**OPINION**

**HUFFMAN, Acting P. J.**—Scottsdale Insurance Company (Scottsdale) appeals a judgment for damages and attorney fees and costs in the amount of $626,513.74 entered against it after court trial in an action by Camelot by the Bay Condominium Owners' Association, Inc. (Camelot). Camelot brought this action for damages for breach of the covenant of good faith and fair dealing as assignee of a policyholder of Scottsdale, the developer of Camelot's premises, Breihan Development, Inc. (Breihan). Camelot cross-appeals the judgment insofar as it represents a reduction by 30 percent of the damages awarded in Camelot's favor, representing Breihan's comparative fault. All of these claims arise out of an underlying action between Camelot and Breihan for construction defects (Camelot by the Bay v. Breihan Development, Inc. (Super. Ct. San Diego County, 1989, No. 610814), the underlying action), in which Breihan agreed with Camelot to have a stipulated judgment in the amount of $675,000 entered against it in exchange for a covenant not to execute, coupled with an assignment of Breihan's rights against Scottsdale to Camelot.

On appeal, Scottsdale first makes a group of related arguments that it did not breach its covenant of good faith and fair dealing in the insurance policy by refusing to settle the underlying lawsuit for an amount within the monetary policy limits, since there was never any threat of a judgment against Breihan in excess of the policy limits. In Scottsdale's view, it justifiably refused to settle noncovered risks, even if Breihan were thereby exposed to personal liability for claims not covered by the insurance policy. Scottsdale additionally contends that it did not breach its covenant of good faith and fair dealing and therefore Breihan was not authorized to breach the policy provisions by entering into the stipulated judgment. Scottsdale further makes contentions that the stipulated judgment entered into by Breihan was not valid and cannot bind Scottsdale because it was collusive, unreasonable in amount, and does not legally obligate Breihan to pay the resulting judgment because of the covenant not to execute; further, Scottsdale argues that Camelot was improperly awarded attorney fees and prejudgment interest. In its cross-appeal, Camelot contends that this is not an appropriate case for the application of the doctrine of comparative bad faith (*California Casualty Gen. Ins. Co.* v. *Superior Court* (1985) 173 Cal.App.3d 274 [218 Cal.Rptr. 817].)

Scottsdale's first group of arguments is dispositive of this appeal, and we need not reach the further issues raised concerning the binding effect of the stipulated judgment reached in this instance, nor concerning the application of comparative bad faith to these facts. Under *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883] (*Comunale*) and its progeny, an insurer's refusal to settle a claim under its policy is unwarranted and a breach of the implied covenant of good faith and fair dealing in the policy "[w]*hen there is great risk of a recovery beyond the policy limits so that the most reasonable manner of disposing of the claim is a settlement which can be made within those limits*, . . ." (*Id.* at p. 659, italics added.) The "reasonableness" of an insurer's disposition of the claim is measured chiefly in relation to the estimated risk of the claimant's recovery beyond the policy limits. Here, the insurance policy monetary limits were $1 million, and Camelot's potential claim was never greater than $937,245. Camelot sought to settle the underlying action for construction defects for $300,000 and, after Scottsdale declined to settle the case for that amount, Camelot and Breihan reached the agreement for the stipulated judgment for $675,000. However, Breihan was never exposed to a potential excess verdict over its policy limits, and there was thus no risk of recovery beyond those policy limits to require Scottsdale, as a reasonable or prudent insurer, to dispose of the claim by settling within the policy limits.

Moreover, we conclude the trial court erred in equating the noncovered defects at the construction project with the defects which were clearly

covered by the insurance policy, and by finding that Scottsdale was required to settle the case in order to cap Breihan's potential loss for both covered and noncovered defects. On this record, the trial court erred in finding Scottsdale had breached the implied covenant of good faith and fair dealing and had acted in bad faith in declining to settle the case under these circumstances. Accordingly, there was no basis for Breihan as the insured to "settle around" the carrier, nor for the trial court to hold Scottsdale was bound by that stipulated judgment in the underlying action. We reverse the judgment with directions to enter judgment for Scottsdale.

### Factual and Procedural Background

The underlying action was a construction defect lawsuit filed by Camelot against Breihan for alleged construction deficiencies at a 23-unit residential condominium complex developed and built by Breihan, primarily through services provided by subcontractors. Sales of the Camelot condominiums occurred in 1985 and 1986. Scottsdale provided liability coverage to Breihan for the period between April 1985 and April 1987. The insurance policies were comprehensive general liability policies with broad form endorsement, with $1 million limits of liability.[1] After suit was filed, Scottsdale initially refused to provide a defense to Breihan, based upon erroneous allegations in the complaint, which were immediately corrected by Camelot's counsel to allege that the deficiencies alleged occurred in late 1986 or 1987, within Scottsdale's policy period. Scottsdale then hired counsel, Attorney Douglas McCorquodale and his associate, Rebecca Ryan, to defend Breihan's interest under a reservation of rights letter dated July 11, 1989. An answer was filed in July 1989, along with a cross-complaint against several subcontractors engaged in the construction of the project.

Camelot offered to compromise its claims against Breihan in July 1989 in the amount of $280,000 (Code Civ. Proc., § 998), but Breihan's retained counsel did not recommend acceptance of that offer based on the insufficient information he had at the time and because he did not believe the offer was made in good faith. Scottsdale then sent a letter dated August 14, 1989, to Breihan, stating that it would not accept the offer based on insufficient information to evaluate the nature and extent of Camelot's claims, and because it was unclear what portion of the claims were covered or not covered by the insurance policy. Scottsdale informed Breihan that it might wish to consider settling with Camelot or responding to the offer in some other fashion.

---

[1] The two policies each had $1 million limits of liability; No. GLS 018645 ran from April 3, 1985, to April 3, 1986, and No. GLS 077087 ran from April 22, 1986, through April 22, 1987.

Breihan's retained counsel continued to prepare a defense against Camelot's allegations, hiring experts, conducting discovery, and filing motions. Attorney fees amounted to approximately $200,000 for retained defense counsel. Depositions of several Camelot homeowners were taken by April 1990, in which they claimed numerous defective conditions at the project, including instances of physical injury to tangible property which had occurred during the insurance policy period. Scottsdale raised statute of limitations defenses to a number of the claimed defects. Trial was set for September 24, 1990, and a mandatory settlement conference was held July 23, 1990. Retained defense counsel for Breihan appeared, but he had no settlement authority and no settlement offers were made. By July 31, 1990, plaintiff's expert's reports showed that its total claimed cost of repair was over $850,000, and plaintiff planned to present a total claim of $937,245.

In August and September 1990, retained defense counsel Ryan informed Scottsdale that in her opinion Camelot's claim was higher than any eventual jury award, but a judgment in the construction defect case would probably exceed $300,000. She thus requested Scottsdale, more than once, to grant settlement authority in the amount of $300,000. Scottsdale refused, seeking additional information concerning manifestation dates and consequential damages. At that time, Camelot was demanding $300,000 to settle the dispute. Its $850,000 cost of repair estimate included both covered and noncovered items. Camelot obtained settlements with various subcontractors amounting to approximately $78,000.

As of the September 13, 1990, settlement conference date, Camelot's settlement demand was $300,000, and Scottsdale's own attorney, William Nebeker, was authorized to make a settlement offer of $75,000, up from the $35,000 previously offered. At the same time, Scottsdale was claiming it would not pay a penny in coverage or settlement, citing an alienated premises exclusion as the rationale for its settlement posture. The settlement judge, Judge Milliken, urged settlement in the range of $300,000 and advised Scottsdale that if it continued to reject the $300,000 offer, he anticipated that Breihan would assign its rights against Scottsdale and stipulate to a judgment against itself.

The settlement conference was continued to September 24, 1990. No Scottsdale representatives appeared except for Attorney Nebeker, who was given $90,000 settlement authority, based on defense cost of repair estimates of $90,000 (not including certain repair costs such as fog coating, retaining wall repairs, and past investigatory and repair expenses). Scottsdale relied partially on the alienated premises exclusion in the policy for rejecting the

$300,000 settlement offer, and also took into account what it believed to be the accurate cost of repair for defects covered by the policy. Breihan responded that any reliance on the alienated premises exclusion was misplaced in light of recent case authority disallowing such an exclusion in a similar broad form endorsement policy, *Maryland Casualty Co.* v. *Reeder* (1990) 221 Cal.App.3d 961 [270 Cal.Rptr. 719].

Three days after the September 24, 1990, settlement conference, which had been unsuccessful, Camelot and Breihan's personal counsel, Eugene Yale, negotiated an agreement calling for a stipulated judgment to be entered in the amount of $675,000 against Breihan in return for a release from the obligation to pay and a promise not to execute judgment. Camelot was also assigned any rights Breihan may have had under its insurance contract. Scottsdale's witness, claims adjuster Phil Metzger, testified at the bad faith trial that he was not aware of this transaction and was shocked that the stipulated judgment had been entered, as he believed settlement negotiations were still ongoing. Retained defense counsel signed the stipulation and the judgment, although Attorney Ryan later testified that she felt the amount of the stipulated judgment was excessive.

On October 1, 1990, the stipulated judgment was put on the record in front of the Honorable Thomas O. LaVoy. The court heard no witnesses and made no factual findings. Scottsdale was not a party to the hearing or the judgment. Breihan's retained counsel McCorquodale stated that he felt the stipulated amount was unreasonable.

The action before us, a bad faith insurance action for damages, prejudgment interest, and attorney fees, based on alleged breach of the covenant of good faith and fair dealing, was filed by Camelot as Breihan's assignee on October 31, 1990.[2] Scottsdale's answer alleged a number of affirmative defenses, including comparative bad faith. Camelot brought a motion for summary judgment, which was taken off calendar as defective and on renewal was denied for failure to negate any of Scottsdale's affirmative defenses. Court trial commenced January 29, 1992, and was completed February 4, 1992. The trial court issued a decision after trial and notice to prepare a statement of decision and judgment, including an award of attorney fees and prejudgment interest. Before the statement of decision was filed, Scottsdale sought reconsideration based on recent case authority, *Smith* v. *State Farm Mut. Auto Ins. Co.* (1992) 5 Cal.App.4th 1104 [7 Cal.Rptr. 131]. (Code Civ. Proc., § 1008.) The motion was denied.

---

[2]The original complaint also alleged breach of insurance contract, but that cause of action was dismissed at the outset of trial.

The trial court issued a statement of decision making detailed findings of fact and conclusions of law. As a finding of fact, the trial court noted that Scottsdale's approach to settlement "was controlled largely by coverage considerations" and Scottsdale gave little consideration to the impact that an adverse verdict in the underlying action might have on Breihan. Although Scottsdale emphasized coverage issues in the underlying action, it never brought a declaratory relief action requesting an adjudication of rights concerning coverage under the insurance policy. By April 15, 1990, Scottsdale was aware due to homeowners' depositions that there were numerous defective conditions at the project, including physical injury to tangible property which occurred during the policy periods. However, from April 1990 until September 1990, Scottsdale did not provide its retained counsel for Breihan settlement authority until $35,000 settlement authority was granted in September 1990. At the September 13 and September 24 settlement conferences, Scottsdale sent its own counsel with settlement authority of $75,000 through $90,000, while Camelot was requesting $300,000. Scottsdale's claims adjuster, Phil Metzger, testified at trial that Scottsdale's reasons for rejecting the $300,000 settlement offer were not only the alienated premises exclusion, but also what Scottsdale believed to be the accurate cost of repair.

The trial court then made factual findings that both Breihan and Scottsdale had placed their own respective interests substantially superior to that of the other, and had not considered settling the case and litigating coverage disputes at a later time. The trial court then found that based on what the parties knew as of September 24, 1990, $300,000 was a reasonable settlement figure in the case, taking into account liability, damage, cost of litigation, and coverage issues. The court noted that immediately after the settlement conferences, Camelot and Breihan had entered into the $675,000 stipulated judgment and assignment agreement, with a covenant not to execute on the judgment. A finding of fact was made that Scottsdale was not aware of this transaction until October 1, 1990, and was not given notice by Breihan of its intent to enter into the transaction. Breihan's retained counsel had signed the stipulation and the judgment. The stipulated judgment was not subjected to any type of judicial scrutiny.

The trial court then made a further factual finding that based on the evidence presented to it, the amount of the stipulated judgment was not unreasonable. The court found the stipulated judgment was supported by actual evidence and represented about 75 percent of the amount Camelot was prepared to present against Breihan if the case had gone to trial. In a footnote, the court observed that liability in the underlying action was fairly

clear, and the dispute centered on the proper method and estimated cost of repairs (in Camelot's view, $850,000; in Breihan's view, $100,000). The court then found the stipulated judgment was negotiated between Camelot and personal counsel for Breihan, reflects a compromise, and there was no evidence that the stipulated judgment was used as a tactic to "set up" Scottsdale for bad faith.

As conclusions of law, the trial court found that the "no action" clause in the insurance policies[3] did not preclude this bad faith action, which did not arise "on the policy" (Ins. Code, § 11580), but rather as a result of Scottsdale's tortious conduct in refusing to settle and thereby exposing Breihan to personal liability.[4] The court then found that the reasoning of the *Comunale* line of cases, that an insurer should not permit coverage beliefs to interfere with and/or dominate its settlement consideration, was applicable in this factual context where some of the defects at the Camelot project were covered and some were not. The court disagreed with Scottsdale's argument that the *Comunale* authority should be limited to cases in which the plaintiff asserted claims in excess of the monetary limits of the policy. In holding that Scottsdale's conduct was actionable here, the trial court explained: "In this case, while it is true that there were substantial policy limits and it was highly unlikely that [Breihan] ever would have had a judgment entered against it in excess of these limits, [Scottsdale]'s failure to give at least equal consideration to the interests of its insured when it rejected the Plaintiff's reasonable settlement of $300,000.00, placed [Breihan] in a position of unnecessary risk. Under the facts of this case, some of the defects at the Plaintiff's project were covered, some were not. By failing to settle the case and thereby 'cap' the loss, [Breihan] was exposed to greater financial risk for those defects which may ultimately have been determined to be non-covered items. This risk could have been avoided had a settlement been reached between [Breihan] and the Plaintiff and the coverage disputes litigated later."

---

[3]The language contained in the insurance policy concerning the "no action" clause is one of the conditions which must be met by the insured in order to bring an action upon the policy. The language is as follows: "No action shall lie against the company *unless, as a condition precedent thereto,* there shall have been full compliance with all of the terms of this policy, nor until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured *after actual trial* or by written agreement of the insured, the claimant and the company." (Italics added.)

[4]We agree with the trial court that Scottsdale was not justified in relying on the insurance policies' "no action" clauses to defeat Camelot's action. This was an assigned bad faith action for breach of the implied covenant of good faith and fair dealing, rather than an action on the policy, such as might have been brought under Insurance Code section 11580, subdivision (b)(2). Similarly, the policy's provisions requiring insured's cooperation and insurer's permission to assign any claims are not applicable in this bad faith context.

The trial court then held that permitting claimant/insured arrangements such as the stipulated judgment in this case, following an insurer's breach of the covenant of good faith and fair dealing, would enhance settlements. The court then found the stipulated judgment arrangement was not collusive, and had been necessitated by Scottsdale's unreasonable approach to settlement negotiations. The trial court emphasized that this was not a coverage case, but an action for breach of the covenant of good faith and fair dealing; thus, Scottsdale could not be required to pay only that portion of the judgment which was "covered."

The court then set forth eight instances in which Scottsdale had breached the covenant of good faith and fair dealing in that it:

"- Refused to attempt to reasonably negotiate settlement of the case on its insured's behalf;

"- Failed to provide retained defense counsel authorization to settle on its in[s]ured's behalf;

"- Repeatedly rejected the advice of retained counsel, who repeatedly recommended settlement in the range of $300,000;

"- Repeatedly rejected plaintiff's reasonable settlement demand of $300,000;

"- Repeatedly failed to give as much consideration to the interests of its insured as its own in conducting settlement negotiations;

"- Repeatedly permitted its belief of non-coverage under its policies to control its decision whether to settle on behalf of its insured;

"- Repeatedly offered unrealistically low figures to settle with Plaintiff; and

"- Repeatedly failed to explore options to settle the Plaintiff's case and reserve coverage disputes between itself and its insured."

Breihan was likewise found to have breached the covenant of good faith and fair dealing owed to Scottsdale in that it:

"- Repeatedly failed to explore options to settle the plaintiff's case and reserve coverage disputes between itself and SCOTTSDALE.

"- Failed to even discuss or attempt to negotiate a settlement with SCOTTSDALE regarding coverage issues.

"- Failed to acknowledge any responsibility for non-covered items of defect.

"- Failed to give sufficient notice to SCOTTSDALE of it[s] intent to enter a stipulated judgment." Judgment for Camelot was accordingly reduced by 30 percent because of its assignor's comparative bad faith.

Finally, the court found that Breihan had suffered a $675,000 judgment against it, legally caused by Scottsdale's unreasonable rejection of the reasonable $300,000 settlement offer. The court noted that Camelot's covenant not to execute on the judgment did not relieve Breihan of the judgment. It was accordingly ordered that once the setoff for Breihan's comparative bad faith was made, Camelot would be entitled to $472,500 plus 10 percent prejudgment interest since the date of the stipulated judgment, October 23, 1990. Camelot was awarded attorney fees as the prevailing party.[5] Scottsdale appealed and Camelot cross-appealed the judgment.

## DISCUSSION

We shall first outline the circumstances under which an insurer's implied obligation of good faith and fair dealing requires it to settle a claim on the policy for a monetary amount within the policy limits. (*Comunale, supra*, 50 Cal.2d at p. 659.) We shall then apply these rules to this judgment in light of the trial court's statement of decision, which found that Scottsdale breached the implied covenant of good faith and fair dealing under these circumstances.

## I

### *Duty to Settle*

■ An insurance policy, like other contracts, contains an implied covenant of good faith and fair dealing that neither party will do anything to injure the right of the other to receive the benefits of the agreement. Such covenant of good faith and fair dealing gives rise to an insurer's obligation, sounding in both contract and tort, to accept a reasonable settlement offer on behalf of its insured. (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 18 [123 Cal.Rptr. 288, 538 P.2d 744] [*Johansen*].)

---

[5]After judgment was issued and a memorandum of costs filed by Camelot, Scottsdale moved to tax costs on the grounds that some of the claimed attorney fees were excessive. The motion was granted in part and the award of attorney fees reduced.

■ "[T]he implied obligation of good faith and fair dealing requires the insurer to settle in an appropriate case although the express terms of the policy do not impose such a duty.

"The insurer, in deciding whether a claim should be compromised, must take into account the interest of the insured and give it at least as much consideration as it does to its own interest. [Citation.] *When there is great risk of a recovery beyond the policy limits so that the most reasonable manner of disposing of the claim is a settlement which can be made within those limits*, a consideration in good faith of the insured's interest requires the insurer to settle the claim. Its unwarranted refusal to do so constitutes a breach of the implied covenant of good faith and fair dealing." (*Comunale, supra,* 50 Cal.2d at p. 659, italics added.)

■ The Supreme Court further explained the rationale for an insurer's liability for an excess judgment: "An insurer who denies coverage does so at its own risk, and . . . if *the denial is found to be wrongful* it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer's breach of the express and implied obligations of the contract." (*Comunale, supra,* 50 Cal.2d at p. 660, italics added.) An insurer may thus be liable in damages to its insured for amounts in excess of the policy limits. However, the policy limits remain as a restriction of the amount the insurer may have to pay to a third party claimant in connection with a claim on the policy. (*Id.* at p. 659.)

Similarly, in *Crisci* v. *Security Ins. Co.*(1967) 66 Cal.2d 425, 432 [58 Cal.Rptr. 13, 426 P.2d 173], the Supreme Court upheld an award of damages to an insured to compensate for excess liability incurred after the insurer refused to settle the claim, holding that it was enough to support the judgment that the insurer " '*knew that there was a considerable risk of substantial recovery beyond said policy limits*' and that 'the defendant did not give as much consideration to the financial interests of its said insured as it gave to its own interests.' " (*Ibid.*, italics added.)

■ Some courts have assumed that an excess judgment must be in existence before a bad faith cause of action can be stated. In *Brown* v. *Guarantee Ins. Co.* (1957) 155 Cal.App.2d 679, 690 [319 P.2d 69, 66 A.L.R.2d 1202] (cited in *Comunale*), the court stated that an insured's cause of action for wrongful refusal to settle a claim arises when the insured incurs a binding judgment over the policy limits. Similarly, *Doser* v. *Middlesex Mutual Ins. Co.* (1980) 101 Cal.App.3d 883, 891-892 [162 Cal.Rptr. 115] and *Finkelstein* v. *20th Century Ins. Co.* (1992) 11 Cal.App.4th 926, 929 [14

Cal.Rptr.2d 305] interpreted *Comunale* as requiring that an insurer may not be sued for bad faith failure to settle if no excess judgment has been entered. This authority presupposes that the insurer's breach of implied duties of good faith and fair dealing is not complete unless an excess judgment has been entered. However, the Supreme Court has not expressly restricted all bad faith actions in this manner. ▆ We thus continue to examine the *Comunale* line of cases: In *Johansen, supra,* 15 Cal.3d at page 16, the Supreme Court said: "[A]n insurer's 'good faith,' though erroneous, belief in noncoverage affords no defense to liability flowing from the insurer's refusal to accept a reasonable settlement offer." (Fn. omitted.) "[A]n insurer who fails to accept a reasonable settlement offer within policy limits because it believes the policy does not provide coverage assumes the risk that it will be held liable for all damages resulting from such refusal, including damages in excess of applicable policy limits." (*Id.* at p. 12.) Thus, *"whenever it is likely that the judgment against the insured will exceed policy limits 'so that the most reasonable manner of disposing of the claim is a settlement which can be made within those limits,* a consideration in good faith of the insured's interest requires the insurer to settle the claim.' [Citations.]" (*Id.* at p. 16, italics added.)[6]

Moreover, in deciding whether to settle the claim, "[T]he insurer must conduct itself as though it alone were liable for the entire amount of the judgment. [Citation.] Thus, the only permissible consideration in evaluating the reasonableness of the settlement offer becomes whether, in light of the victim's injuries and the probable liability of the insured, *the ultimate judgment is likely to exceed the amount of the settlement offer.* Such factors as the limits imposed by the policy, a desire to reduce the amount of future settlements, or a belief that the policy does not provide coverage, should not affect a decision as to whether the settlement offer in question is a reasonable one." (*Johansen, supra,* 15 Cal.3d at p. 16, italics added.)

*Samson* v. *Transamerica Ins. Co.* (1981) 30 Cal.3d 220, 237, 242-243 [178 Cal.Rptr. 343, 636 P.2d 32] is to the same effect. In both these cases, the Supreme Court's definition of the reasonableness of a claimant's settlement offer included a consideration of whether the ultimate judgment against the insured was likely to exceed the amount of the settlement offer, such that the insured might be exposed to excess liability (over policy limits) to the claimant. (*Johansen, supra,* 15 Cal.3d at p. 16.) The Supreme Court further

---

[6]When does such a breach occur? "Assuming bad faith, the breach of the insurer's obligation occurs at the time when it indulges in the unwarranted rejection of a reasonable compromise offer within the policy limits. [Citations.]" (*Critz* v. *Farmers Ins. Group* (1964) 230 Cal.App.2d 788, 797 [41 Cal.Rptr. 401, 12 A.L.R.3d 1142], disapproved in other part by *Crisci* v. *Security Ins. Co., supra,* 66 Cal.2d at p. 430.)

assumes that the insurer is on notice that it might ultimately be exposed to liability to its insured for damages above the policy limits in the event of a breach of implied duties of good faith and fair dealing. It must, however, be recalled that the Supreme Court had set the stage for the entire discussion by stating that whenever it is likely that the judgment against the insured *would exceed policy limits*, so that it was most reasonable to settle it within policy limits, settlement by the insurer was required. (*Ibid.*)

█ To determine the reasonableness of a settlement offer for purposes of a later action against an insurer, the finder of fact must take into account that information available to the insurer at the time of the proposed settlement. (See *Isaacson* v. *California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 793 [244 Cal.Rptr. 655, 750 P.2d 297], citing *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488, 499 [213 Cal.Rptr. 256, 698 P.2d 159].) A trier of fact on the issue of bad faith in a subsequent action must make a wide-ranging inquiry into such criteria as motive, knowledge, experience, and the ability to prophesy. (*Walbrook Ins. Co.* v. *Liberty Mutual Ins. Co.* (1992) 5 Cal.App.4th 1445, 1456-1457 [7 Cal.Rptr.2d 513].) However, the main limiting factor in the calculus for the reasonableness analysis of an insurer's decision on a settlement offer has always been whether there was great risk of a judgment against the insured in favor of a third party claimant, over policy limits. (*Comunale, supra,* 50 Cal.2d at p. 659.)

In summary, the *Comunale* line of cases emphasizes as requirements for insurer liability for breach of the covenant of good faith and fair dealing for failure to settle that (1) ultimately, coverage must be found to exist (*Comunale, supra,* 50 Cal.2d at p. 660); (2) The most reasonable method of resolving a claim is evaluated in light of the probability or risk at settlement time of an excess judgment against the insured (*id.* at p. 659); (3) an unavoidable additional factor in the insurer's "reasonableness analysis" of the settlement decision is whether it may potentially be exposed to additional damages to its insured for any failure to settle (*Johansen, supra,* 15 Cal.3d at pp. 12, 16); and (4) when the settlement decision must be made, the insurer may not allow coverage beliefs or policy limits to control the settlement decision (*id.* at p. 16), but the insurer will not in any case be liable to the third party claimant for more than the policy limits; however, it may be liable to its insured for more than the policy limits in the event of a breach of the implied covenant (*Comunale, supra,* at p. 659). Finally, there is no explicit requirement for bad faith liability that an excess judgment is actually suffered by the insured, since the reasonableness analysis of settlement decisions is performed in terms of the probability or risk that such a judgment may be forthcoming in the future (but see *Doser* v. *Middlesex*

*Mutual Ins. Co.*, *supra*, 101 Cal.App.3d at pp. 891-892 and *Finkelstein* v. *20th Century Ins. Co.*, *supra*, 11 Cal.App.4th at p. 929). However, the actual excess judgment, if any, is highly relevant in any bad faith damages determination. (See pt. III, *post.*)

## II

### *Contentions on Appeal*

In an effort to show it did not breach any duty to settle, Scottsdale first argues that the *Comunale* line of cases should not apply because the $300,000 settlement demand by Camelot was not a policy limits demand (since the policy limit was $1 million) and that because of this gap between the demand and the policy coverage limits, it cannot be said that there was a considerable risk of an excess judgment if the settlement demand were refused. (*Crisci* v. *Security Ins. Co.*, *supra*, 66 Cal.2d at pp. 431-432.) Camelot responds to that argument as follows: "By [Scottsdale]'s logic, liability insurers are free to act as unreasonably as they like so long as it ultimately turns out that excess judgments are not recovered against their insureds. This is obviously not the law. If it were the law, plaintiffs would have to create claims which exceeded policy limits simply to persuade the carrier to act reasonably."

Scottsdale goes on to claim that the *Comunale* line of cases finding breaches of the duty to settle in the excess judgment context should not apply to these facts, where Camelot was apparently claiming both covered and uncovered property damage and the trial court found in the statement of decision that under the facts of this case, some unspecified number of the defects at the plaintiff's project were covered, and some were not. The trial court had concluded that Scottsdale's failure to settle the case and thereby "cap" the loss exposed Breihan to greater financial risk for those defects which would ultimately be determined to be not covered by the insurance policy, and stated, "This risk could have been avoided had a settlement been reached between [Breihan] and the plaintiff and the coverage disputes litigated later."

Attacking this conclusion, Scottsdale draws a distinction between an insured's potential personal liability for covered damages in an amount in excess of the monetary policy limits, and the insured's potential personal liability for defects which fall outside the scope of the policy coverage at all. Scottsdale thus argues that "[e]xposing an insured to uncovered losses which are under the monetary limits of an insurance policy is not a breach of the implied covenant of good faith and fair dealing" and "[e]xposing the insured

to claims which are not covered by its contract of insurance does not amount to bad faith, but merely reflects the terms and conditions of the insurance policy which the insured purchased."

## III

### Analysis

In discussing Scottsdale's contentions, we note at the outset that an insurer's liability for an excess judgment amount suffered by its insured turns not upon its refusal to defend, but upon its refusal to accept an offer of settlement within policy limits. (*Johansen, supra,* 15 Cal.3d at p. 17.)

In any case, this record demonstrates that this was not a case in which the insurer had breached its duty to defend, in addition to failing to settle. Scottsdale was paying retained counsel to defend Breihan in the underlying action, and continued to make settlement offers throughout the settlement proceedings until the time that the stipulated judgment was reached. These settlement offers ranged from $35,000 to $90,000, in the face of Camelot's demand of $300,000. However, at the same time Scottsdale was offering those settlement sums, it was also claiming that it would pay "not a penny," due to its reliance on the alienated premises exclusion in the policy, but also due to its estimated cost of repairs.[7]

Despite the disagreements between Scottsdale and Breihan's retained counsel, and between Scottsdale and its insured, this is not a case in which the insurer abandoned its insured and declined to defend at all. (See *Samson* v. *Transamerica Ins. Co., supra,* 30 Cal.3d at p. 237.) These facts initially seem to bring this case within the coverage of certain authority holding that where an insurer withholds permission from attorneys retained to defend the insured to negotiate or evaluate a settlement of a third party claim on behalf of the insured, the insurer has breached the covenant of good faith and fair dealing. (*Travelers Ins. Co.* v. *Lesher* (1986) 187 Cal.App.3d 169, 188 [231 Cal.Rptr. 791].) Here, the insurer did not allow the attorney it retained on the insured's behalf to negotiate settlement offers and ignored the advice of retained defense counsel to settle. (*Ibid.; Northwestern Mut. Ins. Co.* v. *Farmers' Ins. Group* (1978) 76 Cal.App.3d 1031 [143 Cal.Rptr. 415].)

However, the above authority (*Travelers Ins. Co.* v. *Lesher, supra,* 187 Cal.App.3d at p. 188) is not controlling if, under all the circumstances of the

---

[7]Insurer's continued reliance on the alienated premises exclusion was highly questionable at that time in light of recent case authority, *Maryland Casualty Co.* v. *Reeder, supra,* 221 Cal.App.3d 961.

case, the insurer did not come under a duty to settle this claim. ██ In general, the question of an insurer's good or bad faith "is to be tested against the background of the totality of the circumstances in which the insurer's disputed actions occurred. [Citations.]" (*Walbrook Ins. Co.* v. *Liberty Mutual Ins. Co.*, *supra*, 5 Cal.App.4th at pp. 1455-1456.) ██ At all times, Camelot's demands fell within the Breihan policy limits, so that at all times, the potential club of a probable excess judgment was lacking here. To complicate the situation, the trial court found and it is not disputed on appeal that under the facts of this case "some of the defects at the plaintiff's project were covered, some were not." (For example, statute of limitations defenses existed as to some defects, and claims for defective workmanship not resulting in property damage during these policy periods would not be considered to be covered.)[8] The trial court never made any specific finding as to the upper monetary limits of the policy coverage for the defects shown. Nevertheless, the trial court found that the $300,000 settlement offer was reasonable under all the circumstances (considering potential liability, damage, cost of litigation, and coverage issues) and ruled that Scottsdale had acted in bad faith in refusing to settle this claim and thereby "cap" the loss that Breihan, the insured, might suffer. The court further found that Breihan was "exposed to greater financial risk for those defects which may ultimately have been determined to be noncovered items."

The problem with the trial court's theory is that the reasonableness of a settlement offer cannot be evaluated in a vacuum or merely subjectively by a trial judge presented with a bad faith claim against the insurer, even taking into account the various circumstances of the case. Instead, the *Comunale* line of cases teaches that the most reasonable manner of disposing of a claim may be a settlement within policy limits "whenever it is likely that the judgment against the insured will exceed policy limits." (*Johansen*, *supra*, 15 Cal.3d at p. 16.) The potential excess judgment is the outer parameter by which to measure reasonableness. Although the Supreme Court has also made an even broader formulation of the permissible considerations for evaluating the reasonableness of a settlement offer (i.e., whether "in light of the victim's injuries and the probable liability of the insured, the ultimate judgment is likely to exceed the amount of the settlement offer" (*ibid.*)), the Supreme Court has never retreated from a consideration of probable excess judgment liability of the insured as a factor in determining the reasonableness of the claimant's settlement offer. Nor would it be consistent with this

---

[8]In *Comunale*, *Johansen*, and *Samson*, the basic coverage dispute was whether the particular vehicle involved in the accident was covered at all by the policy; that is a very similar basic coverage problem to that involved here, whether particular property damage fell at all within the scope of the policy provisions. However, in those cases, coverage was found; in this case, only partial coverage existed. (*Comunale*, *supra*, 50 Cal.2d at p. 658; *Johansen*, *supra*, 15 Cal.3d at p. 12; *Samson* v. *Transamerica Ins. Co.*, *supra*, 30 Cal.3d at p. 236.)

line of cases to require an insurer to pay more than its policy limits to settle a third party claimant's claim, even though an insurer may be held liable in damages to its insured for amounts over its policy limits where bad faith has been found. (*Comunale*, *supra*, 50 Cal.2d at p. 659.)

In this case, the trial court faulted Scottsdale for failing to settle the claim, both as to noncovered and covered damages, and suggested that it should have done so and then litigated the coverage disputes later. This ruling was apparently based upon the Supreme Court's statement in *Johansen* that an insurer should not make its determination on a settlement offer based on coverage considerations, but instead may accept a settlement offer while reserving its right with its insured to assert a defense of noncoverage. (*Johansen*, *supra*, 15 Cal.3d at p. 19.) If the insurer has reserved such rights but accepted a reasonable offer, it may seek to establish the noncoverage of the policy and seek reimbursement of the settlement payment from the insured. (*Ibid.*; see *Maryland Casualty Co.* v. *Imperial Contracting Co.* (1989) 212 Cal.App.3d 712, 720-722 [260 Cal.Rptr. 797].)

The trial court's conclusions in this respect return us to the Supreme Court's statement in *Comunale*, *supra*, 50 Cal.2d at page 660, explaining the rationale for an insurer's liability for an excess judgment: "An insurer who denies coverage does so at its own risk, and . . . *if the denial is found to be wrongful* it is liable for the full amount which will compensate the insured . . . ." (Italics added.) We believe the trial court's interpretation of the *Comunale* line of cases to reach its conclusions runs counter to an accepted tenet of insurance law: "The rights of the parties are measured by the contract, and liability of the insurer ordinarily can be imposed only in this manner." (12 Appleman, Insurance Law and Practice, § 7004, pp. 43, 47, fns. omitted.) Thus, the terms and conditions of the insurance policy must dictate the scope of the duties and performance to which the insured is entitled. Ordinarily, the policy limits restrict the amount the insurer may have to pay a third party claimant, but those limits do not restrict an insured's potential damages for the insurer's breach of contract. (*Comunale*, *supra*, 50 Cal.2d at p. 659.) An insurer clearly takes on the duty of protecting, defending, and indemnifying its insured with respect to the scope of coverage that was purchased and attendant duties (defense and settlement). The insurer does not, however, insure the entire range of an insured's well-being, outside the scope of and unrelated to the insurance policy, with respect to paying third party claims. It is an insurer, not a guardian angel. Even if the insurer may not consider its coverage beliefs in deciding whether to accept a settlement offer, it may still bear in mind the distinctions between its potential monetary obligations to the third party claimant and to its insured.

Here, the trial court attempted to hold Scottsdale to a duty to protect Breihan against financial risk for even those defects which would ultimately be determined to be noncovered items. The *Comunale* rule presupposes that an insurer denies coverage at its own risk *if, and only if,* coverage is ultimately found. Essentially, there are two separate coverage questions: coverage within the monetary limits of a policy ("vertical coverage") and substantive coverage of an insurance policy ("horizontal coverage"). These two coverage questions are not readily comparable and should not be confused. We do not believe Scottsdale can reasonably be said to have run the risk of bad faith liability by refusing to settle the case for the amount demanded, where no danger of excess liability of theinsured existed and where it was essentially undisputed that some of the defects at the property fell outside the scope of its policy. Where coverage up to the settlement demand is ultimately found, and an excess judgment is ultimately entered, the situation is far different from the case before us in which some of the defects were found not to be covered and there was never any threat of an excess judgment.

We find support for our conclusions in this respect in a related doctrine, that there is no claim for "a malicious defense" when a defendant chooses to go to trial rather than settling a claim. In *Triplett* v. *Farmers Ins. Exchange* (1994) 24 Cal.App.4th 1415 [29 Cal.Rptr.2d 741], this court reviewed the authority which holds that a party cannot be held liable for merely standing on its right to a trial, as opposed to being required to settle a case. (*Eastin* v. *Bank of Stockton* (1884) 66 Cal. 123, 127 [4 P. 1106]; *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 52 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) Here, in the underlying action, Scottsdale was essentially standing on its right to go to trial rather than settling the case for the amount demanded, which it felt was unsupported by its investigation and its cost estimates. As outlined above, the external limit of a probable excess judgment was not present to require Scottsdale, as a prudent or reasonable insurer, to settle the claim within policy limits rather than go to trial. Moreover, there was no potential of coverage as to some of the claimed damages. (See *Dykstra* v. *Foremost Ins. Co.* (1993) 14 Cal.App.4th 361, 368 [17 Cal.Rptr.2d 543].)

In conclusion, we do not mean to imply unqualified approval of Scottsdale's conduct in the underlying litigation. Certainly, the implied covenant of good faith and fair dealing is a strong incentive to an insurer to act in a reasonable manner in settling claims within policy limits in appropriate situations. The peculiar circumstances of this case, however, persuade us that Scottsdale did not breach the implied covenant of good faith and fair

dealing by failing to meet Camelot's settlement demand, since there was no policy limits exposure to the insured for claimed covered damages to make conclusive the reasonableness of that settlement demand.

Our resolution of this issue makes it unnecessary for us to address the complex issue of whether a stipulated judgment of this nature may support the assignment of a bad faith case. (See *Smith* v. *State Farm Mut. Auto Ins. Co.*, *supra*, 5 Cal.App.4th at p. 1114; *Doser* v. *Middlesex Mutual Ins. Co.*, *supra*, 101 Cal.App.3d at p. 892; *Wright* v. *Fireman's Fund Ins. Companies* (1992) 11 Cal.App.4th 998, 1016-1017 [14 Cal.Rptr.2d 588].) Nor need we address the comparative bad faith issues raised in Camelot's cross-appeal, nor Scottsdale's arguments concerning attorney fees and prejudgment interest. Since we find the judgment must be reversed on the bad faith issues because, as a matter of law, there was no bad faith breach of the implied covenant shown here, we reverse the judgment and direct the trial court to enter judgment in accordance with the principles of this opinion. (See *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 440 [296 P.2d 801, 57 A.L.R.2d 914].)

## Disposition

The judgment is reversed with directions to enter judgment in favor of appellant Scottsdale in accordance with the principles expressed in this opinion. Costs on appeal awarded to appellant Scottsdale.

This disposition renders it unnecessary for this court to address the issues raised by appellant Camelot.

Froehlich, J., and Nares, J., concurred.

A petition for a rehearing was denied August 23, 1994.