45 F.3d 1170
 63 USLW 2501
 CHARTER OAK FIRE INSURANCE COMPANY, Plaintiff-Appellee,
v.
COLOR CONVERTING INDUSTRIES COMPANY, Defendant-Third
Party/Plaintiff-Appellant,
v.
The TRAVELERS INSURANCE COMPANY, Third Party/Defendant-Appellee.
COLOR CONVERTING INDUSTRIES COMPANY, Plaintiff-Appellant,
v.
CHARTER OAK FIRE INSURANCE COMPANY and The Travelers
Insurance Company, Defendants-Appellees.
 Nos. 94-2614, 94-2615.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 8, 1994.
Decided Feb. 3, 1995.
Rehearing and Suggestion for Rehearing En Banc Denied March
15, 1995.
 
 Frank Steeves (argued), Brian Peacy, Crivello, Carlson, Mentkowski & Steeves, Milwaukee, WI, for Charter Oak Fire Ins. Co., Travelers Ins. Co.
 David E. Jarvis, Quarles & Brady, Milwaukee, WI, Kevin P. Crooks, Crooks, Low & Connell, Wausau, WI, Lawrence L. Marcucci (argued), Thomas M. Cunningham, Brenton D. Soderstrum, Ronald M. Kaplan, Shearer, Templer, Pingel & Kaplan, P.C., West Des Moines, IA, for Color Converting Industries Co.
 Before POSNER, Chief Judge, and REAVLEY* and COFFEY, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 Travelers Insurance Company refused to reimburse Color Converting Industries Company, which it had insured against products liability, for a $200,000 settlement that Color Converting had made with a valued customer, American National Can Company. The basis of the insurance company's refusal to cover this loss was the "voluntary payments" provision of the insurance policy. A standard provision, it states that "no insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without consent." Color Converting has sued Travelers (and an affiliate of Travelers', Charter Oak, but that is a detail), charging that Travelers breached an implied duty to settle and acted in bad faith to boot, and in consequence should not be allowed to set up the voluntary-payments clause as a defense. The district judge granted summary judgment for Travelers. The parties agree that Iowa law governs the substantive issues in this diversity litigation; Color Converting has its principal place of business there and the insurance contract was made there.
 
 
 2
 Color Converting makes ink. American National, its biggest customer, asked one of Color Converting's salesmen whether it could use a certain type of ink, made by Color Converting, on a particular type of packaging. The salesman said yes. American National switched to that ink, and as a result some output was ruined. That was in the fall of 1990. Shortly afterward, American National demanded $235,000 in compensation for the ruined output from Color Converting, which notified its insurance agent though not Travelers directly. In June of 1991 representatives of American National and Color Converting met. American National agreed to reduce its products liability claim to $200,000. Travelers construes this as Color Converting's having agreed to settle American National's products liability claim for that amount. But the characterization is disputed, so we do not rely on it, the case having been decided as we noted on summary judgment. Color Converting notified the insurance agent that the claim was now $200,000, and the agent notified Travelers. By then it was July. Travelers assigned claims handlers to investigate the claim. We do not understand Color Converting to be arguing that Travelers should have done so earlier.
 
 
 3
 In November, Travelers decided that the accident was covered by the insurance policy, but it was unsure about its insured's liability to American National and it was particularly uncertain about the size of the loss--and this in two respects. First, American National might have been at fault as well as Color Converting--might have known that the substitute ink could cause problems. In that event, Color Converting's liability might be reduced (though not eliminated), in accordance with the principle of comparative negligence. Second, Travelers could not be sure that American National had actually lost $200,000. It wanted invoices and other documentation that would show the material and labor costs that American National had incurred in producing the output ruined by the use of the wrong ink. Why that information was germane is unclear. If a tortfeasor destroys your goods, you are entitled to their market value and not merely to the costs that you incurred to produce them. Barnhouse v. Hawkeye State Bank, 406 N.W.2d 181, 183 (Ia.1987); Ruden v. Hansen, 206 N.W.2d 713, 718 (Ia.1973); Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark, 39 F.3d 812, 821 (7th Cir.1994). But Color Converting does not question the relevance of the cost information sought by Travelers. Apparently all that American National was seeking was the cost of the ruined output, not the cost plus the anticipated profit built into the market price. If so, this is some indication that $200,000 was a reasonable--even a modest--demand. So it seems to us, at any rate. But Color Converting does not argue that American National may have been seeking less than it was legally entitled to, so we do not pursue the point.
 
 
 4
 American National refused to turn over the cost data sought by Travelers, on the ground that the data were proprietary. Travelers offered to sign an agreement not to disclose the data. American National refused, believing, whether rightly or wrongly, that Color Converting had acknowledged the legitimacy of the $200,000 claim, so that American National had nothing to gain from playing ball with the insurance company. Color Converting, in an effort to satisfy Travelers that $200,000 was a reasonable settlement (an effort that supports, by the way, Travelers' characterization of its insured's agreement of June 1991 with American National), estimated American National's costs from industry averages. Travelers refused to accept the estimate, on the ground that American National's costs might well be below the average for its industry, since American National was a very successful firm. Color Converting argues that Travelers was being overcautious; and for purposes of this appeal we accept the argument.
 
 
 5
 Matters were at an impasse when on August 27, 1992, American National told Color Converting that unless it received $200,000 by September 4 it would stop doing business with it. Color Converting informed Travelers of this demand, but the insurance company refused to make a settlement offer to American National. It took the position that if Color Converting yielded to American National's demand, Travelers would invoke the voluntary-payments clause of the insurance contract and refuse to reimburse Color Converting. Unwilling to lose its biggest customer, Color Converting paid American National $200,000. Travelers refused to reimburse it, and this litigation ensued.
 
 
 6
 We do not find any basis in Iowa law, or in that of any other state except Louisiana, Emile M. Babst Co. v. Nichols Construction Corp., 488 So.2d 699 (La.App.1986), and possibly (though possibly not) Nebraska and California, see Otteman v. Interstate Fire & Casualty Co., 172 Neb. 574, 111 N.W.2d 97, 102 (1961); Bodenhamer v. Superior Court, 192 Cal.App.3d 1472, 1476, 238 Cal.Rptr. 177, 181 (1987); Johnson v. Mutual Benefit Life Ins. Co., 847 F.2d 600, 603 (9th Cir.1988) (applying California law), for interpolating into a contract of liability insurance a promise by the insurer to handle a claim in a manner that will minimize the business risk, as distinct from the liability risk, to the insured. The interpolation was expressly rejected in Coil Anodizers, Inc. v. Wolverine Ins. Co., 120 Mich.App. 118, 327 N.W.2d 416 (1983), a case cited with approval by Iowa's highest court in North Iowa State Bank v. Allied Mutual Ins. Co., 471 N.W.2d 824, 827 (Ia.1991), albeit without discussion of the precise issue. Cf. Wierck v. Grinnell Mutual Reinsurance Co., 456 N.W.2d 191 (Ia.1990). Plenty of cases, it is true, say that if the existence and extent of the insurance company's liability are clear, yet the company unreasonably delays in paying (and obviously if it refuses to defend the insured against the tort suit), the insurance contract has been broken and the insured can resort to appropriate self-help, including settling with its tort victim. E.g., Henke v. Iowa Home Mutual Casualty Co., 250 Iowa 1123, 97 N.W.2d 168, 173-74 (1959); Isadore Rosen & Sons, Inc. v. Security Mutual Ins. Co., 31 N.Y.2d 343, 339 N.Y.S.2d 97, 100-02, 291 N.E.2d 380, 382-83 (1972); Fireman's Fund Ins. Co. v. Security Ins. Co., 72 N.J. 63, 367 A.2d 864 (1976); Camelot by the Bay v. Scottsdale Ins. Co., 27 Cal.App.4th 33, 32 Cal.Rptr.2d 354, 364 (1994); Diamond Heights Homeowners Ass'n v. National American Ins. Co., 227 Cal.App.3d 563, 277 Cal.Rptr. 906, 916 (1991). At first glance these decisions are flatly inconsistent with Coil Anodizers--and one of the decisions is from Iowa (Henke ). But when they are examined closely, the conflict dissolves.
 
 
 7
 The principal contractual duty that an insurer's delay in coming to terms with the insured's tort victim can violate is the implied duty, illustrated in Iowa by such cases as Wierck and Henke, to manage the defense of the liability claim in such a fashion as will minimize the risk to the insured of an excess judgment. Because insurance policies have limits, a liability insurance company might prefer to roll the dice and litigate with its insured's tort victim, knowing that its liability was capped at the policy limit and that if it was lucky and won the case it would not have to pay anything. The insured would prefer the insurance company to pay right up to the policy limit if by doing so it could eliminate the danger of a judgment above that limit, since any difference between the judgment and the policy limit would be payable out of the insured's own pocket. It is entirely reasonable to suppose that had the parties to the insurance policy thought about this conflict of interest between insurer and insured, they would have agreed that the insurance company was not to exploit it, was instead to act as if there were no policy limit when it came to decide whether to settle or to litigate. Wierck v. Grinnell Mutual Reinsurance Co., supra, 456 N.W.2d at 195; Kooyman v. Farm Bureau Mutual Ins. Co., 315 N.W.2d 30, 34-35 (Ia.1982); Twin City Fire Ins. Co. v. Country Mutual Ins. Co., 23 F.3d 1175, 1181 (7th Cir.1994); see generally Symposium on the Law of Bad Faith in Contract and Insurance, 72 Tex.L.Rev. 1203, 1295-1628 (1994). This is the origin and rationale of the implied duty to settle, as it is often called, or the duty of good faith in dealing with a third party (American National) on behalf of the insured, or the duty of handling a claim in a way that so far as possible protects the insured against having to pay an excess judgment. Henke was such a case; also Fireman's Fund and Camelot by the Bay, while Diamond Heights plays a variation on the theme in the setting of an excess insurer's conflict of interest.
 
 
 8
 All these duties--the same duty, really, under different labels, although the "bad faith" label enables the insured to obtain tort damages rather than just breach of contract damages, Dolan v. Aid Ins. Co., 431 N.W.2d 790 (Ia.1988); Jack Walters & Sons Corp. v. Morton Building, Inc., 737 F.2d 698, 711 (7th Cir.1984)--derive from the basic duty of the liability insurer, that of indemnifying the insured against liability. So the insurer must not delay unreasonably in coming to terms with the insured's tort victim, lest the result be either an excess judgment against the insured or, what is the same thing from the insured's standpoint, a settlement in excess of the policy limits. Twin City Fire Ins. Co. v. Country Mutual Ins. Co., supra, was such a case. The primary insurer's foot-dragging resulted in a settlement in excess of the policy limits (to the prejudice of the excess insurer, whose position is similar to that of an insured). A more alert handling of the claim might have averted this result.
 
 
 9
 The duty advocated by Color Converting goes beyond anything that we have described so far, for it is cut loose from any risk of excess judgments or settlements. There was never any doubt that Travelers would protect Color Converting fully against tort liability to American National for selling a defective product. The policy limit was $1 million, and the largest amount sought by American National was only $235,000. The danger was nil that by dragging its heels in negotiating a settlement with American National, Travelers would make Color Converting dig into its own pocket to pay a portion of American National's tort claim. The only risk Travelers was creating was the risk that Color Converting might lose a customer. That is not a risk against which Travelers agreed to insure Color Converting.
 
 
 10
 Such insurance would be foolhardy to write, at least without an enormous premium. Products liability is (with the rare exception of a product that injures a bystander) liability for harm to a customer. Sellers of products do not want to harm their customers. If they do so by accident, as happened here, they are eager to make amends, especially when they can do so at no cost to themselves, or at least no cost greater than the possible increase in insurance premiums that impends whenever an insurer has to pay a claim. Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark, supra. They do not want to anger valued customers--and American National Can appears to have been Color Converting's most valued customer--by questioning the accuracy or honesty of the claim, or by trying to shift the fault to the customer, or by failing to pay the claim promptly. If the insurance company has an implied duty to cooperate with its insured to the extent necessary to avoid offending powerful customers, the opening for collusive and exaggerated claims of products liability will be immense. It would be unrealistic to suppose that, in the absence of any language in the policy suggestive of such an undertaking, the parties had agreed that the insurance company would shoulder this duty. The danger of collusion between an insured and its customers, just as between an insured and the members of the insured's family, is one against which insurance companies assiduously endeavor to protect themselves. See American Guarantee & Liability Ins. Co. v. Chandler Mfg. Co., 467 N.W.2d 226, 229 (Ia.1991); Holt v. Utica Mutual Ins. Co., 157 Ariz. 477, 483, 759 P.2d 623, 629 (1988); Merchants Mutual Ins. Co. v. Transformer Service, Inc., 112 N.H. 360, 298 A.2d 112, 115 (1972).
 
 
 11
 There are additional reasons for doubting that the parties intended to insure Color Converting against the consequences of being coerced by its best customer. First, the risk of such coercion is in part within the power of the supplier, that is to say of the potential victim of the coercion, since it can be reduced by the supplier's avoiding becoming dependent on one or a few customers. Insurance companies are reluctant to insure against risks that the insured controls. Such insurance would give the insured an incentive to increase risk, since he would have shifted the cost of the increased risk to the insurance company. This problem goes by the name of "moral hazard" and lies behind such statements as, "insurers' assumptions of risk are usually limited to those beyond the 'effective control' of the insured." Knutson Construction Co. v. St. Paul Fire & Marine Ins. Co., 396 N.W.2d 229, 233-34 (Minn.1986). Second, it won't do a supplier who is at the mercy of its customer much good to be insured against the customer's taking advantage of its economic power in a particular way, such as by making unreasonable demands to settle claims. The customer can always exercise its power in an alternative form, most straightforwardly simply by demanding a lower price. And third, once the customer is paid by the insured, its incentive to cooperate with the insurance company is eliminated, and that is a harm to the company. The cost to Travelers of investigating American National's claim against Color Converting was higher than it would otherwise have been because American National, having been paid, had no incentive to turn over to Travelers the cost data necessary to substantiate the claim.
 
 
 12
 To all this, Color Converting might reply that the danger of collusion is exaggerated. If the insured does settle and then turns around and seeks reimbursement from the insurance company, it will have to prove that the settlement was reasonable. Indeed it will. E.g., Isaacson v. California Ins. Guarantee Ass'n, 44 Cal.3d 775, 244 Cal.Rptr. 655, 666, 750 P.2d 297, 308 (1988); Miller v. Shugart, 316 N.W.2d 729 (Minn.1982). These are cases in which an insured settled in circumstances where, because the insurance company had not conceded coverage, the insured's personal assets were at risk. They are analytically similar to cases in which the insurance company's foot-dragging places the insured at risk of an excess judgment. Nothing in our opinion is intended to question the insurance company's liability in either type of case.
 
 
 13
 But as insurance companies are not popular litigants, they want to manage the settlement process themselves rather than have to persuade a court that the insured acted precipitately. See United Services Automobile Ass'n v. Morris, 154 Ariz. 113, 119-20, 741 P.2d 246, 252-53 (1987). We can imagine a liability insurance contract that entitled the insured to settle any claim without consulting the insurer, provided only that the settlement was reasonable. That is not this contract, however, and we daresay the insured would have had to pay a higher premium if it had wanted this additional freedom of action that it might use to safeguard its customer relations.
 
 
 14
 Color Converting might point out that the only duty it seeks to fasten on the insurance company is a duty of due diligence in the handling of claims, and who could object to requiring an insurance company merely to be careful? But one person's due diligence is another person's foot-dragging. As the facts of this case illustrate, the question whether an insurance company is doing too much investigating is a nice one, difficult to resolve by the methods of litigation. We should hesitate to place insurers on a razor's edge, for of course their failure to do enough investigating can make them liable in tort damages to the insured, as in our recent Transcraft case. Liability is a pretty blunt instrument for shaping behavior, so when there is liability for doing too little of a thing, the law should hesitate before imposing liability for doing too much of it. Cf. DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 203, 109 S.Ct. 998, 1007, 103 L.Ed.2d 249 (1989); United Steelworkers of America v. Weber, 443 U.S. 193, 210, 99 S.Ct. 2721, 2730-31, 61 L.Ed.2d 480 (1979) (concurring opinion).
 
 
 15
 But the main objection to the imposition of a general duty of due diligence in claims handling has nothing to do with the vagaries of litigation as a method of resolving difficult questions of judgment, such as when to stop investigating a claim. It has to do with the purpose that Color Converting assigns to the duty. The purpose is to protect the insured from the loss of a valued customer. If that loss is outside the scope of the insurance policy, as we believe, then a lack of diligent effort to prevent it cannot be a breach of duty by the insurance company, any more than it would be a breach of its duty for the insurance company to refuse to reimburse its insured for the cost of a price cut that American National Bank might have extracted from Color Converting because a fire in a plant of American National's had put American National in a desperate position, where price relief from its suppliers was imperative for its survival.
 
 
 16
 The basis for charging Travelers with a lack of diligence is the ultimatum that American National issued to Color Converting: pay us $200,000 or we will stop buying from you. Without the ultimatum, Travelers could have taken its sweet time in verifying the loss claimed by American National. But it was not to protect against such ultimata that Travelers agreed to insure Color Converting against products liability. So the fact--if it is a fact--that it acted with insufficient alacrity to avert the ultimatum is not a ground for finding a breach of the insurance contract. To make the insurer's duty depend on an ultimatum from the insured's irate customer would merely amplify the danger of collusion between insured and injured at the expense of the insurer.
 
 
 17
 The basis for the ultimatum, we emphasize, was not anything Travelers did; it was American National's power as Color Converting's major customer. But for that power, American National could not have "shaken down" Color Converting to the tune of $200,000 when Color Converting's liability and the extent of American National's damages were still in doubt. Travelers cannot be blamed for American National's power or forced to knuckle under to it.
 
 
 18
 Duty in the law is usually duty toward someone for something rather than a free-floating, open-ended, and universal duty. Cf. Palsgraf v. Long Island R.R., 248 N.Y. 339, 162 N.E. 99 (1928). Although there is no general duty of due diligence in the handling of claims, we have acknowledged, and indeed emphasize, that a specific such duty may arise as a correlate of the duties that the insurance contract does create. A lack of diligence could as we have said give rise to a breach of the insurance contract if the consequence were to expose the insured to an excess judgment. The implied duty to protect the insured from that risk entails due care in the handling of claims, as in the Twin City case, if the risk is significant--as it was not here, however. If the insurance company has an opportunity to settle the case at or below the policy limit, but through negligence in investigation misses the opportunity and as a result the insured has to dig into his own pocket to satisfy the claim, the insurance company is liable.
 
 
 19
 It could be argued that the principle which animates this result is that the insurer, whose undertaking to defend claims against the insured places him in a fiduciary relation to the insured, just as if he were the insured's lawyer, is required to act as if its own wealth were at stake in the defense. This is a common enough formula of fiduciary duty in general and the duty of a liability insurer to its insured in particular; we have used it ourselves. Twin City Fire Ins. Co. v. Country Mutual Ins. Co., supra, 23 F.3d at 1181; see also Long v. McAllister, 319 N.W.2d 256, 262 (Ia.1982). But in law to rest on a formula, as Holmes was wont to say, is a slumber that prolonged means death. If the insurance company is required to do exactly as the insured would do if the latter had no insurance, then it might be required to settle a completely groundless claim if, because the claimant was a valued customer of the insured, the latter would have settled the claim despite its being groundless. An insurer is not the insured's alter ego. Its fiduciary duty is bounded by its contractual undertakings, which here did not include the protection of customer relations.
 
 
 20
 Another source of what we are insisting is the insurer's limited duty of careful handling of claims against the insured arises from the possibility that the insurer might dawdle in the handling of a claim in order to avoid its duty of indemnifying the insured. Consider the following variant of the facts of this case. Travelers acknowledges coverage and liability and also acknowledges that the amount of the loss for which the insured is liable is indeed $200,000. Its investigation is complete. American National has turned over all the documentation sought. Nothing remains but for Travelers to cut a check. But knowing that American National is getting impatient and is about to issue an ultimatum that Color Converting will not feel able to reject, Travelers decides to delay the payment of the claim with the intention of inducing Color Converting to settle and then invoking the voluntary-payments clause to excuse itself from having ever to pay.
 
 
 21
 In these circumstances Travelers would be estopped to invoke the clause as a defense to a suit for indemnity. Isadore Rosen & Sons, Inc. v. Security Mutual Ins. Co., supra, illustrates the principle. The insured, a subcontractor, was accused by his general contractor of having negligently damaged a roof. The general contractor refused to pay the $80,000 it owed the subcontractor for the latter's work unless the subcontractor agreed to a deduction of some $16,000 in settlement of the general contractor's claim. The insurer "did absolutely nothing to adjust or otherwise process the claim." 339 N.Y.S.2d at 100-01, 291 N.E.2d at 382. (So at least the plaintiff attested, and for purposes of the appeal the court was obliged to treat the attestation as true.) By doing absolutely nothing, the insurer violated its duty to defend--a contractual duty--and so was estopped to use the voluntary-payments clause as a defense. A later New York decision describes Rosen as a case of "economic coercion." Servidone Construction Corp. v. Security Ins. Co., 64 N.Y.2d 419, 488 N.Y.S.2d 139, 142, 477 N.E.2d 441, 444 (1985). The point was not that the insurer had insured the subcontractor against the consequences of economic coercion, or even that knowledge of the subcontractor's bind required the insurer to act with extra alacrity to settle the claim. The point was only that, knowing the bind its insured was in, the insurer could not, by deliberately retarding its investigation, in effect compel the insured to violate the voluntary-payments clause.
 
 
 22
 There is nothing esoteric about this result. A party to a contract who without justification prevents the other party from complying with its terms cannot use that breach to get out of his obligations. Sheer Construction, Inc. v. W. Hodgman & Sons, Inc., 326 N.W.2d 328, 332 (Ia.1982); Cenco Inc. v. Seidman & Seidman, 686 F.2d 449, 453 (7th Cir.1982); Spanos v. Skouras Theaters Corp., 364 F.2d 161, 169 (2d Cir.1966) (en banc) (Friendly, J.). Not making a voluntary payment to a claimant is a condition of the insured's right to indemnity under the insurance contract. If the insurer by its own breach prevents the insured from complying with this condition, the insurer cannot use the insured's breach of the condition as an excuse.
 
 
 23
 In our hypothetical case, as in Rosen, the insurer's conduct is fairly described as a deliberate, opportunistic breach of the contractual duty to defend. Cf. Bodenhamer v. Superior Court, supra, 238 Cal.Rptr. at 181. That is not a plausible characterization of the present case. Construed as favorably to Color Converting as the record permits, the facts show that Travelers was overly cautious, overly suspicious, in its handling of American National's claim against its insured. It wanted proof that Color Converting was actually liable to American National for $200,000, or more precisely that $200,000 would be a reasonable settlement of American National's claim. Color Converting does not point to a clause in the insurance contract that required Travelers to act with greater promptness, given that there was no risk of an excess judgment or an excess settlement. So a breach by Travelers is not a possible basis for estoppel; there was no breach. And there is no evidence that Travelers, believing the settlement to be reasonable--having no doubts--stalled in the hope that Color Converting would trip over the voluntary-payments clause.
 
 
 24
 It is tempting to suppose that if the insurance company was careless (here in the sense of being too cautious, too suspicious), and the insured suffered, the insurance company has done wrong and should pay. There are dicta to that effect in many of the cases, such as Rosen and Diamond Heights, that involve refusals to settle or delay in settling. But dicta are dicta. There is no contention that when Travelers undertook to insure Color Converting, it was told and agreed that it must be prepared to handle claims by American National with special care because it is Color Converting's best customer and is therefore able to coerce a settlement. Cf. Hadley v. Baxendale, 9 Ex. 341, 156 Eng.Rep. 145 (1854); EVRA Corp. v. Swiss Bank Corp., 673 F.2d 951, 955-56 (7th Cir.1982). The insurer's only relevant undertakings, neither of which was violated here, were not to expose Color Converting to the risk of an excess judgment or settlement and not to deliberately precipitate an action by Color Converting that would excuse Travelers from having to honor its duty to indemnify. Iowa can impose additional duties on insurance companies if it wants to. But we cannot find in Iowa law any basis for thinking that it would impose the exotic variety of liability for which the insured in this case contends.
 
 
 25
 We need not decide whether the suit is also barred by a clause in the insurance policy requiring the insured to "cooperate with us [Travelers] in the investigation, settlement, or defense of the claim or 'suit.' " Whether or not Color Converting actually agreed with American National to settle the latter's claim for $200,000, in the course of various discussions between those parties Color Converting made acknowledgments of fault that American National could have used against it in any products liability lawsuit arising out of the accident. To arm the adversary is the antithesis of cooperation with the insurance company. Sargent v. Johnson, 551 F.2d 221, 232 (8th Cir.1977). Some of these acknowledgments might be shielded from the knowledge of a jury under the rule making settlement negotiations privileged (Fed.R.Evid. 408 and its state counterparts). But to acknowledge that Color Converting and American National engaged in settlement negotiations behind the back of the insurance company would be to confess to a breach by Color Converting of the insurance contract, Griggs v. Bertram, 88 N.J. 347, 443 A.2d 163, 169 (1982), thus giving Travelers still another ground for refusing to reimburse Color Converting for the expense of the settlement with American National.
 
 
 26
 AFFIRMED.
 
 
 
 *
 Hon. Thomas M. Reavley of the Fifth Circuit