ATLAS TACK CORPORATION *vs.* LIBERTY MUTUAL INSURANCE
COMPANY.

No. 97-P-1944.

Suffolk. February 16, 1999. - December 22, 1999.

Present: ARMSTRONG, BROWN, & SPINA, JJ.[1]

*Insurance,* Comprehensive liability insurance, Coverage, Construction of
policy, Insurer's obligation to defend, Notice. *Contract,* Insurance,
Construction of contract. *Notice,* Insurance claim.

The insured under a comprehensive general liability insurance policy breached
the plain language of the "voluntary payment" clause by agreeing in a
consent judgment to assume liability for the complete cleanup of the
insured's contaminated manufacturing site and by making substantial pay-
ments pursuant to the agreement, all before notifying the insurer;
consequently, the insurer was not bound to defend the insured against
claims brought by the Commonwealth and the Federal Environmental
Protection Agency arising from the contamination of the site. [383-386]

CIVIL ACTION commenced in the Superior Court Department on
August 22, 1991.

A motion for partial summary judgment was heard by *Robert
A. Mulligan,* J., and entry of separate and final judgment was
ordered by him.

*James E. McGuire* for the plaintiff.

*Carol A. Kelly* for the defendant.

*Laura A. Foggan & Daniel E. Troy,* of the District of
Columbia, *& Paul E. Dwyer, Jr.,* for Insurance Environmental
Litigation Association, amicus curiae, submitted a brief.

ARMSTRONG, J. These cross appeals from a partial final sum-
mary judgment concern the existence of an insurer's duty to
defend the plaintiff corporation (Atlas Tack) against pollution

---

[1]This appeal was argued before Justices Armstrong, Brown, and Spina. Fol-
lowing Justice Spina's appointment to the Supreme Judicial Court, Justice
Kass was added to the panel and participated in the decision.

claims of the Commonwealth and the Federal Environmental Protection Agency arising from contamination at Atlas Tack's manufacturing site. We hold that the insurer (Liberty) owed no duty to defend because Atlas Tack unilaterally assumed responsibility for cleaning up the site in violation of a voluntary payment clause of the insurance contract.

The factual and procedural history of the case is extensive. For many years, Atlas Tack manufactured tacks, steel nails, rivets, and eyelets at its Fairhaven factory site located 1,000 feet northwest of Buzzards Bay and bordered by wetlands and residential neighborhoods. From the 1940's until 1978, the factory discharged industrial waste sludges containing cyanide, acids, solvents, and heavy metals, from processes such as electroplating, into an unlined, manmade lagoon some 200 feet from the factory building. Wastes could and allegedly did escape from the lagoon by seepage through leaks in side walls, and by occasional overflows.

From 1949 to 1979, Liberty issued comprehensive general liability insurance to Atlas Tack.[2] In its policies, Liberty agreed "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident" and to "defend any suit against the insured alleging such injury . . . or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent." An "owned-property" clause excluded coverage for "injury to or destruction of . . . property owned or occupied by or rented to the insured."[3] A "voluntary payment" clause provided that "[t]he insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the accident."

During the 1970's and early 1980's, State and Federal

---

[2]Contained in the record are copies of eight policies covering the periods January 1, 1960, to January 1, 1967, and December 31, 1967, to January 15, 1970. Some of these copies appeared to the judges below, and to us, to be incomplete. There is no dispute, however, as to the proof of coverage on its essential terms; the only issue is how certain provisions should be applied in this case.

[3]This language appeared in all but two of the Liberty policies contained in the record.

environmental agencies cited Atlas Tack for pollution viola-
tions. On January 14, 1981, the Massachusetts Department of
Environmental Quality Engineering (DEQE)[4] sent Atlas Tack
notice that "hazardous wastes were being stored on the
premises, specifically the lagoon . . . for more than 90 days
without a valid license" and requested that Atlas Tack state its
"intentions and proposed schedules relative to compliance." On
October 19, 1982, DEQE informed Atlas Tack that laboratory
analysis of samples of the sludge in the lagoon "indicate that
the contents of the Atlas Tack lagoon fall within the jurisdiction
of 310 CMR Hazardous Waste Regulations and exhibit a
potential harm to the environment resulting from improper stor-
age and disposal." The agency advised Atlas Tack to hire a
"licensed professional engineer, knowledgeable in closure of
waste water lagoons, to explore feasible options." An October
25, 1983, letter from DEQE informed Atlas Tack that the lagoon
at the site constituted a violation of chapters 21C and 21E of
the General Laws. Although Atlas Tack retained an engineering
firm, it had not submitted an acceptable waste removal plan by
the fall of 1983, causing DEQE to refer the matter to the At-
torney General. By that time, DEQE had determined that the
waste was contaminating the groundwater or threatening to do
so.

On June 27, 1984, DEQE filed a complaint against Atlas
Tack, based on the Massachusetts Clean Waters Act, G. L. c. 21,
§§ 26-53, and the public nuisance doctrine. Several days later,
on July 2, 1984, the parties agreed to a final consent judgment.
It is undisputed that Atlas Tack did not notify Liberty of the
impending consent judgment or of the events preceding it, much
less obtain Liberty's approval. The consent judgment required
in part that Atlas Tack submit and implement by certain
deadlines "a comprehensive plan prepared by qualified profes-
sional engineers, knowledgeable in the field of water pollution,
for the complete clean up of the lagoon and surrounding area, if
necessary, at the site and the removal of all pollutants to ap-
propriate waste facilities."

Early in the compliance period, Atlas Tack fell behind
schedule and received numerous notices from the Attorney
General and DEQE that it was not in compliance with the
consent judgment. On June 21, 1985, DEQE sent Atlas a

---

[4]That agency is now known as the Department of Environmental Protection
(DEP). See St. 1989, c. 240, § 101.

"Notice of Responsibility" under G. L. c. 21E, § 4, informing it that the lagoon "contains a listed hazardous waste . . . ; namely, a wastewater treatment sludge generated from electroplating operations,"[5] demanding corrective action and warning of potential penalties for noncompliance. Ultimately, DEQE assumed control of emptying the lagoon. It hired an engineering firm as well as a contractor to perform the work, for which Atlas Tack was to foot the bill.

On October 29, 1985, Atlas Tack filed an action against the Commonwealth and joined the contractor. The complaint stated that Atlas Tack had already paid out over $255,000 in cleanup costs and sought adjudication of further amounts payable to the contractor for completing the removal of the lagoon sludge from the site, and also sought to avoid being charged with a trebling of the Commonwealth's response costs pursuant to G. L. c. 21E. Atlas Tack challenged the reasonableness of the bills submitted by the contractor and alleged that the manner of sludge removal exceeded the scope of the consent judgment because of the Commonwealth's alleged recharacterization of the waste from "special" to "hazardous." As the cleanup efforts to date evidently had not been enough, on January 9, 1986, the Commonwealth filed a counterclaim alleging that "[t]he materials in the lagoon area and in the building at the Atlas [Tack] site are hazardous materials as defined in [G. L. c. 21E, § 2]," and that "[t]here were and continue to be releases and threats of release of hazardous materials, within the meaning of [G. L. c. 21E, §§ 2 and 5], from the Atlas [Tack] site." The counterclaim also sought reimbursement from Atlas Tack under G. L. c. 21E for all past and future costs of assessing, containing and removing the hazardous materials. It was after this counterclaim that Atlas Tack first notified Liberty of the existence of environmental claims regarding the Fairhaven site and sought defense and indemnification as to the Commonwealth's counterclaim as well as to the 1984 action by the Commonwealth that resulted in the consent decree.

During the same period, the United States Environmental Protection Agency (EPA) had also become involved with the Fairhaven site. In 1982, an EPA engineer had reported the apparent disposal of hazardous materials at the facility. In 1988, the site was nominated to be a "Superfund" site, that is, to be

---

[5]Compare 310 Code Mass. Regs. § 30.131 (1995) (listing wastewater treatment sludges from electroplating operations as hazardous wastes).

placed on the National Priorities List of the Federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq. (1994); in 1990, the site's listing was approved. In July, 1990, the EPA notified Atlas Tack that it would conduct a "Remedial Investigation and Feasibility Study" (RI/FS) of the site "to determine the nature and extent of hazardous substance contamination . . . as a basis for a cleanup plan for the site." On March 16, 1992, EPA notified Atlas Tack through a "Potentially Responsible Party" (PRP) letter[6] that Atlas Tack was likely accountable for "the release or threatened release of hazardous substances or pollutants or contaminants" at the site and might be required to remediate or to pay EPA to remediate. On May 28, 1992, Atlas Tack notified Liberty of the PRP letter and demanded a defense and indemnification from the EPA claims.

Atlas Tack brought the present action against Liberty (and other insurers not involved in this appeal) on August 22, 1991, seeking both past and future costs of defense and indemnification for the claims of the Commonwealth and the EPA.[7] Liberty moved for summary judgment on several grounds including Atlas Tack's breach of the "voluntary payment" clause, its failure to give timely notice of any claims, and a lack of coverage due to the "owned-property" exclusion. A judge of the Superior Court ruled that "[t]he liability of Liberty . . . for expenditures and/or costs incurred or to be incurred by [Atlas Tack] on account of liability for damage to or the prevention of damage to the property (including groundwater) of others will stand for trial." Atlas Tack then moved for partial summary judgment regarding the issue of Liberty's duty to defend. The judge allowed that motion, ordering Liberty to "pay forthwith all costs and expenses incurred by Atlas [Tack] . . . on account of claims by EPA or the Commonwealth . . . arising out of damage to the property of others (including groundwater) or arising out of the prevention of damage to the property of others (including groundwater)" and to commence defending Atlas Tack against such claims. The court later clarified that Liberty's duty to defend arose on January 9, 1986, when the Commonwealth filed its counterclaim against Atlas Tack. After the

---

[6]For the significance of a PRP letter, see *Hazen Paper Co.* v. *United States Fid. & Guar. Co.*, 407 Mass. 689, 690-697 (1990).

[7]Atlas Tack also claimed violations of G. L. c. 93A and G. L. c. 176D. These claims are not at issue on appeal.

parties disagreed on the calculation of the amount of past defense costs, the judge appointed a special master to do the calculation. The master allowed certain costs submitted by Atlas Tack and disallowed others (most notably engineering expenses of investigating the nature and extent of contamination). The court then entered a partial final judgment under Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974), incorporating its earlier ruling on the duty to defend and adopting the master's report. Both sides appealed.

One issue, in our view, is decisive of both appeals: namely, Liberty's meritorious contention that it may deny coverage based on the voluntary payment clause. In *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 123 (1991), the court held that an insurer was entitled to deny coverage on the basis of a voluntary payment clause where the insured, without notifying the insurer or obtaining its permission, had "agreed to a settlement, entered into a consent judgment, assumed the obligation to pay the entire cost of the cleanup, and in fact paid a portion of that cost." Similarly, Atlas Tack breached the voluntary payment clause when it broadly agreed in the 1984 consent judgment to "the complete clean up of the lagoon and surrounding area, if necessary, at the site and the removal of all pollutants to appropriate waste facilities,"[8] and made substantial payments pursuant to that agreement, all before notifying Liberty. Although the general rule is that the insured's noncompliance with a voluntary payment clause does not discharge the insurer's contractual duty unless the insurer demonstrates actual prejudice, see *Sarnafil, Inc.* v. *Peerless Ins. Co.*, 418 Mass. 295, 305-306 (1994); *Employers' Liab. Assur. Corp.* v. *Hoechst Celanese Corp.*, 43 Mass. App. Ct. 465, 479-481 (1997), the court in *Augat* required no further showing of prejudice where the record clearly established that the insured's breach undermined the purpose of the voluntary payment clause — that of giving the insurer an opportunity to protect its interests. The court noted that by the time the insured involved the insurer, "it was too late for the insurer to act to protect its interests.

---

[8]Atlas Tack's agreement was not made "involuntary" for purposes of the voluntary payment clause because it may have been threatened with civil penalties or treble damages at the time the Commonwealth asked it to enter the consent judgment. See *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. at 122 ("the decision was 'voluntary,' however, because [the insured] had an alternative — it had the right to demand that [the insurer] defend the claim and assume the obligation to pay for the cleanup").

There was nothing left for the insurer to do but issue a check." 410 Mass. at 123. The facts in this case are indistinguishable in material respects from those in *Augat,* where "the particular facts established prejudice without more." *Employers' Liab. Assur. Corp.* v. *Hoechst Celanese Corp.*, 43 Mass. App. Ct. at 481.

Atlas Tack counters that the 1984 agreement was in several respects narrower in scope than the subsequent claims by the Commonwealth and the EPA, and hence it did not voluntarily assume an obligation coextensive with those claims. First, Atlas Tack argues that it agreed only to remove the lagoon contents insofar as they were considered "special" waste, not "hazardous" waste. It is true that, at the time of the judgment, DEQE and Atlas Tack were characterizing the waste not as "hazardous," but as "special,"[9] a designation apparently allowing its disposal at a fairly conventional solid waste landfill rather than more expensively at a specialized hazardous waste disposal facility. See 310 Code Mass. Regs. § 19.061 (1994). Any assertion to that effect is simply overwhelmed by the plain language of the judgment, which broadly committed Atlas Tack to the removal of all "pollutants," a term that, consistent with its usage in the complaint (see paragraph below) and definition under the Clean Waters Act,[10] would apply to the contaminants released by Atlas Tack regardless of their specific characterization as "special" or "hazardous."[11]

Second, Atlas Tack argues that the Commonwealth's 1986 counterclaim was "materially different" from the 1984 litigation "because of its new assertion of actual or potential damage to third party property and groundwater from 'hazardous'

---

[9]"Special Waste means any solid waste that is determined not to be a hazardous waste pursuant to 310 CMR 30.000 and that exists in such quantity or in such chemical or physical state, or any combination thereof, so that particular management controls are required to prevent an adverse impact from the collection, transport, transfer, storage, processing, treatment or disposal of the solid waste." 310 Code Mass. Regs. § 19.006 (1994).

[10]In that act, "pollutant" is defined as "any element or property of sewage, agricultural, industrial or commercial waste, runoff, leachate, heated effluent, or other matter, in whatever form and whether originating at a point or major nonpoint source, which is or may be discharged, drained or otherwise introduced into any sewerage system, treatment works or waters of the commonwealth." G. L. c. 21, § 26A.

[11]We also note that, as a matter of record in the related appeal of *Atlas Tack Corp.* v. *Donabed*, 47 Mass. App. Ct. 221 (1999), the president of Atlas Tack, M. Leonard Lewis, admitted that "Atlas Tack never asked any lawyer for advice as to whether the materials in the lagoon were or were not hazardous."

wastes." By 1986, however, there was nothing "new" to the allegation of offsite pollution impacts. The complaint in the 1984 action made clear that a prime objective of the suit was the abatement of groundwater contamination and damage to adjacent property.[12] That complaint alleged, in part, that the wastes in the lagoon were "pollutants" as defined in the Massachusetts Clean Waters Act; that the wastes "are leaching into the groundwater and the surrounding wetlands"; that "Atlas [Tack's] storage and disposal of pollutants on the site is dangerous to human health, safety or welfare or to the environment"; that Atlas Tack was "discharging pollutants into the waters of the Commonwealth in violation of [the Massachusetts Clean Waters Act,] G. L. c. 21, § 43"; and that "[t]he leaching of pollutants into waters of the Commonwealth is causing significant damage to natural resources of the Commonwealth, is a threat to public health, represents substantial and material annoyance, discomfort, and damage to the citizens of Massachusetts, and constitutes a public nuisance."[13] The prayer for relief sought "the complete containment and removal of the pollutants on the site . . . and [a] further order [to] Atlas [Tack] to cease its discharge of pollutants into waters of the Commonwealth and to abate the public nuisance created thereby." Under the Massachusetts Clean Waters Act, the terms "waters" and "waters of the commonwealth" include groundwaters as well as various surface waters. See G. L. c. 21, § 26A. See also G. L. c. 21E, § 2.

Atlas Tack may not fairly contend that the 1986 counterclaim by the Commonwealth for the first time raised issues concerning chemical contamination inside the factory building as opposed to the lagoon. Aside from the broad language of the 1984 consent order (committing to "the complete clean up of the

---

[12]In discovery, Atlas Tack admitted that it "knew about groundwater contamination at or near the site prior to [July 1, 1983]."

[13]The complaint also stated a claim for the reimbursement by Atlas Tack of the Commonwealth's costs in investigating the discharge of pollutants at the site. The Commonwealth claimed it had incurred such expenses pursuant to its statutory duty under then-existing G. L. c. 21, § 27(14), to "[u]ndertake immediately whenever there is spillage, seepage or other discharge of oil or hazardous material into or proximate to any of the waters of the commonwealth or into any offshore waters which may result in damage to the waters, shores or natural resources utilized or enjoyed by citizens of the commonwealth to cause said spillage, seepage or discharge to be contained and removed."

lagoon and surrounding area, if necessary, at the site and the removal of all pollutants"), it is evident that Atlas Tack had committed to DEQE, prior to notifying Liberty of any claims, that it would clean up the building as well. Atlas Tack expressly stated in its October, 1985, complaint against the Commonwealth that its claims were meant "to exclude any pollutants, contaminants or substances that may have been stored within the building. Atlas seeks no relief in this civil action at this time with respect to the separate difficulties that are there being abated under separate understandings with DEQE." See *Atlas Tack Corp.* v. *Donabed,* 47 Mass. App. Ct. 221, 222 (1999) ("In July, 1984, [Atlas Tack] entered into an agreement with the [DEQE] to do environmental cleanup work inside its plant in Fairhaven as well as at a lagoon located near the plant").[14]

Finally, Atlas Tack is unable to point out a sufficient difference between the claims of the Commonwealth and the EPA such that its voluntary assumption of responsibility as to the Commonwealth's claim should not also vitiate Liberty's duty to defend the EPA claim. To the contrary, Atlas Tack admits in its brief that "there is little, if any, meaningful distinction to be made between the Commonwealth's and EPA claims. In fact, the EPA claims were simply a continuation and furtherance of the Commonwealth's claims." Our review of the record convinces us that this statement is correct. In terms of having committed itself before the insurer could assess the situation or attempt to negotiate the claims, the assumption of liability by Atlas Tack reached what EPA demanded as well as what DEQE had earlier demanded.

Because the voluntary assumption of liability for the site cleanup on the part of Atlas Tack violated the "voluntary payment" clause of the insurance contract, Liberty was not bound to defend Atlas Tack against the claims of the Commonwealth or the EPA. The judgment entered on July 24, 1997, is vacated and the case is remanded to the Superior Court for entry of a judgment for Liberty.

*So ordered.*

---

[14]The appellate briefs and record in that related case indicate that when DEQE directed Atlas Tack to remove materials from the interior of the building, Atlas Tack did not resist but instead complied.