The WEST BEND COMPANY,
Plaintiff,

v.

CHIAPHUA INDUSTRIES, INC. and
Royal Insurance Company of
America, Defendants.

No. 98–C–567.

United States District Court,
E.D. Wisconsin.

Aug. 29, 2000.

L. William Staudenmaier, Stacy C. Gerber Ward, Cook & Franke, Milwaukee, WI, for Plaintiff.

James C. Ratzel, Ratzel & Associates, Brookfield, WI, for Defendants.

## DECISION AND ORDER

RANDA, District Judge.

This diversity case comes before the Court on cross-motions for summary judgment by the plaintiff, The West Bend Company ("West Bend"), and defendants Chiaphua Industries, Inc. ("Chiaphua") and Royal Insurance Company of America ("Royal"). Chiaphua supplied hot air corn poppers to West Bend, including a unit that allegedly caused a 1989 fire in the Bloomfield, Connecticut home of Richard and Pamela Root–Palazzolo. In 1997, West Bend settled a products liability suit arising out of the fire for $120,000. At approximately the same time, West Bend first notified Chiaphua and Royal concerning the Root–Palazzolo suit. West Bend now seeks indemnification from Chiaphua on the basis of language set forth in the purchase order for the popcorn popper allegedly involved in the fire. West Bend is also an additional named insured on a policy of liability insurance issued by Royal to Chiaphua, and seeks indemnification from Royal on that basis.

The defendants argue that West Bend's failure to provide timely notice of the Root–Palazzolo matter precludes recovery under either the indemnification clause in the purchase order or the Royal policy. Additionally, Royal invokes the defense that West Bend's voluntary payments in settlement of the Root–Palazzolo suit negate any indemnity obligations that Royal may have in connection with the fire. For the reasons set forth below, the Court enters summary judgment in favor of the defendants and against the plaintiff.

## BACKGROUND

### I. The Parties

West Bend, headquartered in the Wisconsin town of the same name, manufactures and sells small kitchen appliances. Stipulation of Facts ("Facts"), ¶ 1. Some of the products sold by West Bend are manufactured by other companies, such as Chiaphua, a manufacturer based in Hong Kong. *Id.*, ¶¶ 2–3. Among the products manufactured by Chiaphua and sold to West Bend during the 1980's was a hot air corn popper ("the popper"). *Id.*, ¶ 5. In connection with the sale of the popper, West Bend issued a purchase order that contained the terms of the sale, including the following:

> Seller warrants the goods covered by this order are merchantable and fit for their intended purpose, safe for consumer use either alone or when combined in Buyer's product and acceptance of this order shall constitute an agreement on Seller's part to indemnify, defend, and hold harmless Buyer from and against all claims, liabilities, losses, damages or expenses including reasonable attorneys' fees, arising from or by reason of actual or claimed fault or defect or suitability or any litigation based thereon, with respect to any goods or part thereof covered by this order. This obligation shall survive acceptance of the goods and payment therefore by the Buyer. Seller shall provide Buyer a certificate of insurance providing Buyer product liability coverage from companies acceptable to Buyer in amounts not less than $1,000,000 per occurance [sic].

Affidavit of Donald Theisen ("Theisen Aff."), Exhibit A (Feb. 29, 1980 Purchase Order); Facts, ¶ 37.

In keeping with its contractual obligations, Chiaphua procured liability coverage from Royal, an Illinois insurance company that is licensed to do business in the

State of Wisconsin. *Id.*, ¶ 4. Royal issued a Commercial General Liability Policy ("CGL") to Chiaphua, Policy No. P SP-112318 0089, with effective dates from April 15, 1989 to April 15, 1990 ("the Policy"). Affidavit of Stacy C. Gerber Ward ("Ward Aff."), Exhibit A. A vendors endorsement names West Bend as an additional insured under the Policy. *Id.*; Facts, ¶ 33. Among the terms and conditions of the Policy are provisions regarding the duties of insureds in the event of an occurrence, claim or suit. Ward Aff., Exhibit A. Specifically, Section IV, Subsection 2 provides as follows:

a. You must see to it that we are notified promptly of an 'occurrence' which may result in a claim. Notice should include:

(1) How, when and where the 'occurrence' took place; and

(2) The names and addresses of any injured persons and witnesses;

b. If a claim is made or 'suit' is brought against any insured, you must see to it that we receive prompt written notice of the claim or 'suit';

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit;'

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation, settlement or defense of the claim or 'suit;' and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

*Id.* (Bates No. 000045).

## II. *The 1989 Fire*

On October 28, 1989, a fire occurred at the Root–Palazzolo home in Bloomfield, Connecticut. Facts, ¶ 8. The Bloomfield Fire Department conducted an investigation and determined that the cause of the fire had been the overheating of a West Bend popper, which the parties concede was one of the units manufactured by Chiaphua and sold to West Bend. *Id.*, ¶¶ 6, 10 & Exhibit B. The Root–Palazzolos had owned the popper for several years and had used it without incident. *Id.*, ¶ 13. At the time of the fire, babysitter Leslie Feikle was in charge of the Root–Palazzolo home. *Id.*, ¶ 11. Feikle claims that she turned on the popper, went upstairs, and returned a short while later to find the popper on fire. *Id.*, ¶ 12 & Exhibit F (Feikle Statement). According to the Root–Palazzolos, the resulting fire caused $230,000 in damage, including extensive smoke damage. *Id.*, ¶ 16 & Exhibits B, E. Initially, at least, the losses claimed by the Root–Palazzolos' public adjuster appeared to be greatly exaggerated. Facts, Exhibit H (Bates No. 010046). In the end, however, Crum & Forster paid out the entire $230,000. Complaint, ¶ 7.

Lawrence J. Dove Associates ("Dove") was retained by the Root–Palazzolos' property insurer, Crum & Forster, to conduct an investigation into the cause and origin of the fire. Facts, ¶ 20. Dove concluded that the popper had been the source of ignition for the fire. *Id.*, Exhibit G. Dove opined that the "overtemperature device built into the unit" had a design defect, in that it "didn't function to limit the heat energy and prevent appliance overheating and fire." *Id.* Additionally, Dove noted that the unit, known as "The Poppery (TM)," did not have an automatic shutoff device that would turn the machine off after a specified period of time. *Id.* Dove's conclusions were based in part upon non-

destructive testing of the unit that allegedly caused the fire, as well as inspection of an exemplar unit. *Id.*

Neither Chiaphua nor Royal were informed concerning the fire, the investigation as to its cause and origin, or the ensuing claims adjustment process.

### III. *The Underlying Litigation*

In October of 1992, three years after the fire, Crum & Forster initiated a subrogation action against West Bend in Connecticut, seeking to recover the payments it had made to the Root–Palazzolos in connection with the fire. *Id.*, ¶ 24. West Bend hired Attorney Thomas Hagarty of the law firm of Halloran & Sage to defend it against the product liability claims asserted in the lawsuit. *Id.*, ¶ 25. Although Hagarty filed an answer on behalf of West Bend, it appears that he did little else. For example, Hagarty did not take any depositions or hire any experts,[1] nor did he explore the issue of potential insurance coverage for the claim. *Id.*, ¶¶ 26–30. In May 1997, after the case had languished for several years, West Bend settled with Crum & Forster for $120,000. *Id.*, ¶ 31.

### IV. *Notice to Chiaphua and Royal*

The parties have stipulated that Royal and Chiaphua lacked any kind of notice concerning any aspect of the fire or the lawsuit against West Bend until May of 1997. *Id.*, ¶¶ 34–35. On May 1, 1997, by which time the ink on the settlement agreement was apparently dry, West Bend notified Chiaphua of these matters for the very first time. West Bend's Greg Miller informed Chiaphua by fax that:

> We recently got involved in a product liability case featuring a hot air corn popper that was made by Chiaphua for West Bend [illegible] years ago.... it

was a situation where the corn popper was determined by the local fire department to be the cause of a fire that completely destroyed a house. It appears that this case will be settled for $120,000. Of course, we have all our attorneys' fees in addition to the settlement [illegible].

> I believe Chiaphua carried a $1,000,000 product liability insurance policy on the production of this product. The insurance policy was a condition of doing business with us at that time.

> Would you kindly forward to me the insurance policy number as well as the person to contact within the organization[?]

Ratzel Aff., Appendix (Bates No. 000610). In response to this communication, Chiaphua did not waste any time contacting Royal, although it was not until about a year later that Royal formally denied West Bend's request for indemnification. Complaint, Exhibit C. Royal acknowledged that West Bend was an additional insured under the Policy and that the underlying litigation "appear[ed] to be covered by the policy, as there [was] an 'occurrence' and 'property damage' as those terms are defined in the policy." *Id.* However, Royal denied any obligation to indemnify West Bend on the grounds that West Bend had failed to comply with the conditions of the Policy (quoted above) relating to notice and "voluntary payments." *Id.* Royal noted that West Bend had waited years to notify it concerning the underlying litigation, by which time a settlement had been reached. Because of this late notice, "[Royal] had no input into anything; not the conduct of the defense, not the liability evaluations; not the propriety of Crum & Forster's figures; nothing." *Id.*

---

1. In correspondence to West Bend, Hagarty observed that he considered Dove's conclusions with respect to the defective nature of the popper "a bit far-fetched since, if accurate, any such popcorn popper would be a fire waiting to happen [and] presumably this has not been [West Bend's] experience." Affidavit of James C. Ratzel ("Ratzel Aff."), Appendix (Bates No. 100035–36). Hagarty went on to recommend that the popper be examined either internally by West Bend or by an outside expert, or both. However, an expert was never retained to examine the popper. Facts, ¶ 28.

## ANALYSIS

### I. *Summary Judgment Standard*

The standards governing motions for summary judgment are well established. Pursuant to Rule 56(c):

> summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(citing Fed.R.Civ.P. 56(c)).

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.,* at 327, 106 S.Ct. 2548. Summary judgment "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co.,* 794 F.Supp. 328, 330 (E.D.Mo.1992). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While a *material* fact is one that is "outcome determinative under the governing law," *Whetstine v. Gates*

Rubber Co., 895 F.2d 388, 392 (7th Cir. 1990), a *genuine* issue as to that material fact is raised only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The question whether a material issue of fact is *genuine* necessarily requires "some quantitative determination of sufficiency of the evidence." Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183, 186 (1987). "Of course, a court still cannot resolve factual disputes that could go to a jury at trial, ... [b]ut no longer need the trial court leave every sufficiency issue for trial or a later directed verdict motion." *Id.* "A district judge faced with [a summary judgment motion] must decide ... whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff would have a fair chance of obtaining a verdict. If not, the motion should be granted and the case dismissed." *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572–73 (7th Cir.1989) (citations omitted). Thus, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[A] party must produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Co.,* 853 F.2d 768, 771–72 (10th Cir.1988). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

### II. *Choice of Law*

When a federal district court's jurisdiction is based on the diverse citizenship of the parties under 28 U.S.C. § 1332, as it is here, the Court applies state substantive law. *Erie R.R. v. Tompkins,* 304 U.S. 64,

78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In this case, the parties agree that the law of the forum, *i.e.*, Wisconsin, should govern. Of course, West Bend, which is the indemnitee under both the purchase order agreement with Chiaphua and the Royal policy, has its principal place of business here. In any event, since the parties have not raised a conflict of laws issue, the Court will apply Wisconsin law. *Transamerica Insurance Company v. South,* 975 F.2d 321, 327 (7th Cir.1992).

### III. *West Bend May Not Recover Because It Failed to Provide Timely Notice as Required by the Policy*

■ As an initial matter, the Court must decide whether the notice requirements of the Royal policy apply to West Bend, or only to Chiaphua. West Bend argues that because it was an additional insured under the Royal policy, it had no duty to give Royal timely notice of claims or suits. An additional insured's lack of knowledge concerning the *existence* of coverage can sometimes excuse delayed notice. *See, e.g., Hartford Accident and Indem. Co. v. Creasy,* 530 S.W.2d 778 (Tenn. 1975), *overruled on different grounds, Alcazar v. Hayes,* 982 S.W.2d 845 (Tenn. 1998). However, as a general rule, an additional insured that seeks to recover under a policy must have complied with the notice requirements of the policy. *Structure Tone v. Burgess Steel Products Corp.,* 249 A.D.2d 144, 672 N.Y.S.2d 33, 34 (N.Y.App.Div.1998); *Greater Chicago Auction, Inc. v. Abram,* 25 Ill.App.3d 667, 323 N.E.2d 818 (1975); *Central Surety & Insurance Corp. v. Anderson,* 446 S.W.2d 897, 901 (Civ.App.Tex.1969). In this case, West Bend knew that liability coverage existed because it had insisted on such coverage as a condition of Chiaphua doing business with West Bend. Accordingly, West Bend's status as an additional insured will not excuse it from compliance with the notice requirements of the Royal policy.

The purpose of timely notice is to "afford the insurer an opportunity to investigate possible claims against it or its insured while the witnesses are available and their memories are fresh." *Kolbeck v. Rural Mutual Insurance Co.,* 70 Wis.2d 655, 235 N.W.2d 466 (1975); *see also* Charles C. Marvel, Annotation, *Modern Status of Rules Requiring Liability Insurer to Show Prejudice to Escape Liability Because of Insured's Failure or Delay in Giving Notice of Accident or Claim,* 32 A.L.R.4th 141 (1984). Prompt notice:

> also allows the insurer to gather the information necessary to determine whether a claim is fraudulent. In addition, notice provisions enable insurers to end or correct dangerous conditions. The object of all of these goals is to provide the insurer with an opportunity to protect its interests. Finally, insurers require notice of claims in order to establish adequate reserves against potential liability and to calculate premiums.

Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 4.02[a] (10th Ed.2000) (citations and quotations omitted).

■ In Wisconsin, "the insurer's right to receive timely notice of a claim ... is a condition precedent to the insurer's contractual duties to both defend and indemnify." *U.S. Fire Insurance Co. v. Green Bay Packaging, Inc.,* 66 F.Supp.2d 987, 1000 (E.D.Wis.1999). The Royal policy requires "prompt" notification "of an 'occurrence' which may result in a claim," and, similarly, "prompt" written notice of an actual claim or suit. Ward Aff., Exhibit A (Bates No. 000045). As the Wisconsin Supreme Court has observed, "'the words 'immediately,' 'forthwith,' 'promptly,' [and] 'as soon as practicable[']' all require notice in a 'reasonable time.'" *Gerrard Realty Corp. v. American States Insurance Co.,* 89 Wis.2d 130, 277 N.W.2d 863 (1979) (quoting 5A Appleman, *Insurance Law and Practice* §§ 3501–3503). What constitutes a "reasonable time" is sometimes a

factual question; but, "where the facts are not in dispute, and the inferences are certain, it is a question of law for the court." *RTE Corp. v. Maryland Casualty Co.*, 74 Wis.2d 614, 247 N.W.2d 171, 178 (1976). West Bend's notice to Royal came nearly eight years after the fire at the Root–Palazzolo home and almost five years after the Root–Palazzolo's property insurer filed its subrogation action against West Bend in Connecticut. As a matter of law, the Court finds that this was an unreasonable delay. *Id.* However, this does not end the Court's inquiry because late notice will not relieve an insurer of its duties under the policy unless the insurer has been prejudiced as a result of the delay in receiving notice. *Zenith Insurance Co. v. Employers Insurance of Wausau*, 141 F.3d 300, 307 (7th Cir.1998). To make matters more complicated, the application of the "notice-prejudice" rule varies depending upon how lengthy the delay has been. Late notices that arrive within one year of the time required by the policy are governed by W.S.A. § 631.81, which provides:

> (1) Timeliness of notice. Provided notice or proof of loss is furnished as soon as reasonably possible and within one year after the time it was required by the policy, failure to furnish such notice or proof of loss within the time required by the policy does not invalidate or reduce a claim unless the insurer is prejudiced thereby and it was reasonably possible to meet the time limit.

In *Gerrard*, the Wisconsin Supreme Court addressed a situation in which late notice had been provided more than a year after it should have arrived. The *Gerrard* court held that "where notice is given more than one year after the time required by the policy, there is a rebuttable presumption of prejudice and the burden of proof shifts to the claimant to prove that the insurer was not prejudiced by the untimely notice." *Id.* at 872. Because this case falls within

the rule announced in *Gerrard*, West Bend "must prove the lack of prejudice by direct and conclusive evidence." *Id.*

■ The Court does not believe that West Bend can meet its burden of demonstrating a lack of prejudice. Indeed, on the largely undisputed facts of this case, the Court finds that the only reasonable conclusion a jury could reach is that Royal *was* prejudiced by West Bend's late notice. Royal had no opportunity to investigate or evaluate the Root–Palazzolo matter until 1997, nearly eight years after the fire. To put this delay in perspective, Ms. Feikle, the sixteen year high-school junior who had been babysitting at the Root–Palazzolo home at the time of the fire, was by 1997 in her mid–20's. In the intervening time frame, with Royal still in the dark concerning its potential liability, the underlying litigation commenced. West Bend did not mount a vigorous defense. The popper was never evaluated by an expert. Facts, ¶ 29.[2] Indeed, West Bend never even contacted the manufacturer of the allegedly defective product, Chiaphua, until after the case had settled. Ms. Feikle, who set up the popper and witnessed the fire in its early stages, was never deposed. Facts, ¶ 27. There was absolutely no effort, as far as the record reflects, to assess the validity of the Root–Palazzolo's claimed damages.

West Bend attempts to draw parallels between its investigation and defense of the Root–Palazzolo matter and the investigation and defense being conducted by Royal in another popper case, *Abrams v. The West Bend Co.* However, as Royal points out, there are significant differences between the two cases precisely because Royal has had an opportunity to control the investigation and defense of *Abrams*. For example, there have been depositions in *Abrams*; Royal has retained and consulted with fire and engineering experts;

---

**2.** Of course, Crum & Forster, the Root–Palazzolos property insurer, retained an expert to investigate the popper, but Crum & Forster had every incentive to find a third-party liable

in connection with the fire. Otherwise, it could not recover, *via* subrogation, amounts paid to the Root–Palazzolos.

Royal is closely monitoring defense counsel and evaluating the strengths and weaknesses of the case; and the manufacturer has had an opportunity to evaluate the product in question and provide expertise. In light of these differences, West Bend's reliance on Royal's handling of the *Abrams* litigation is not persuasive.

By the time the Root–Palazzolo matter came to the attention of David Hubbell, a Royal claims representative, in 1997, the case "was settled, done deal, check was being issued." Hubbell Aff., p. 72. Accordingly, there was "absolutely nothing [Royal] could do with the claim." *Id.* Had Royal been notified promptly, however, it could have conducted its own investigation, while memories of the fire were fresh, it could have inspected the popper, and it could have probed the question of whether the Root–Palazzolos inflated their damages claim, as initially suspected by Crum & Forster's adjuster. There is no way of knowing, for sure, whether these activities would have served to reduce the settlement value of the case. In other words, Royal cannot prove that the case would have settled for less than $120,000 had it been involved from an early stage. On the other hand, it is not Royal's burden to prove that it was prejudiced by late notice. Rather, because of the considerable delay in notifying Royal, it is West Bend's burden to prove by "direct and conclusive evidence" that Royal was *not* prejudiced. *Gerrard*, 277 N.W.2d at 872. West Bend's "evidence" (or rather, its argument) is not conclusive. In light of the significant questions Royal has raised about the investigation and defense of the Root–Palazzolo claim, a reasonable jury could not conclude that there was a lack of prejudice to Royal from the years-long delay in providing notice. Accordingly, the Court will enter summary judgment in favor of Royal and against West Bend.

## IV. West Bend Surrendered Its Right to Indemnification by Making "Voluntary Payments" in Settlement of the Underlying Litigation Without Royal's Consent

As an alternative ground for the entry of summary judgment in Royal's favor, the Court finds that whatever duty Royal may have had to indemnify West Bend was abrogated by West Bend's unilateral decision to settle the underlying litigation.[3] The Royal policy clearly states: "No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." Ward Aff., Exhibit A (Bates No. 000045). Such provisions exist to give the insurer—which is being asked to foot the bill—an opportunity to protect its interests. *Atlas Tack Corp. v. Liberty Mutual Insurance Co.*, 48 Mass.App.Ct. 378, 721 N.E.2d 8, 12 (1999). More specifically, "[t]heir purpose is to prevent collusion as well as to invest the insurer with the complete control and direction of the defense or compromise of suits or claims." *Truck Insurance Exchange v. Unigard Insurance Co.*, 79 Cal.App.4th 966, 94 Cal. Rptr.2d 516, 523 (2000).

West Bend does not dispute that its decision to settle the underlying litigation was "voluntary." *Compare Maryland Casualty Co. v. Wausau Chemical Corp., et al.*, 809 F.Supp. 680 (W.D.Wis.1992); *see also Unigard*, 94 Cal.Rptr.2d at 524 n. 15. Instead, West Bend argues that the voluntary payments clause of the insurance contract may be disregarded because the settlement did not prejudice Royal. Whether the breach of a voluntary payments clause will bar coverage in the absence of prejudice to the insurer is an issue that no appellate court in the State of Wisconsin has yet addressed. West Bend maintains that the voluntary payments clause is analogous to the notice provisions of the policy,

---

**3.** Because the Court agrees with Royal that late notice and breach of the voluntary payments clause bar West Bend from recovery, the Court need not address the policy defenses discussed in Section III of Royal's brief, including breach of the "no action" clause.

discussed above, and to clauses requiring policyholders to cooperate in the defense or settlement of claims or suits. Since a showing of prejudice is required before an insurer may disclaim coverage on the basis of late notice or failure to cooperate, *see, e.g., Simonds v. Bouton,* 87 Wis.2d 302, 274 N.W.2d 666 (1979), prejudice should also be required when a clause prohibiting voluntary payments has been breached.

Some courts have agreed with West Bend, holding that "[s]ince the reason for ... a [voluntary payments] clause is fear of prejudice to the insurer, it is reasonable to require a showing of prejudice." *Roberts Oil Co., Inc. v. Transamerica Insurance Co.,* 113 N.M. 745, 833 P.2d 222, 229 (1992); *see also Aetna Casulaty & Surety Co. v. Dow Chemical Co.,* 10 F.Supp.2d 800, 830 (E.D.Mich.1998) (following *Roberts Oil* ). Other courts disagree, and hold that "unlike a notice provision or a cooperation clause, a 'no voluntary payment' provision can be enforced *without* a showing of prejudice." *Unigard,* 94 Cal.Rptr.2d at 524 (emphasis added); *Jamestown Builders, Inc. v. General Star Indemnity Co.,* 77 Cal.App.4th 341, 91 Cal.Rptr.2d 514, 519–20 (4th Dist.1999); *Travelers Indemnity Co. v. Liberty Mutual Insurance Co.,* 1997 WL 102506, *7 (N.D.Cal.1997); *Champion Spark Plug Co. v. Fidelity & Casualty Co. of New York,* 116 Ohio App.3d 258, 687 N.E.2d 785, 793 (1996); *Faust v. The Travelers,* 55 F.3d 471–73 (9th Cir.1995); *Xebec Development Partners v. National Union Fire Insurance Co.,* 12 Cal.App.4th 501, 15 Cal.Rptr.2d 726, 763 (6th Dist. 1993); *see also Atlas Tack,* 721 N.E.2d at 12 (and authorities cited therein).

As noted, there is no Wisconsin precedent addressing the effect of an insured's breach of a voluntary payments clause. As a federal court sitting in diversity, this Court is free to look to other jurisdictions for guidance, but of course it must "proceed with caution in making pronouncements about state law." *Lexington Insurance Co. v. Rugg & Knopp, Inc.,* 165 F.3d 1087, 1092–93 (7th Cir.1999). In this case,

the Court need not decide whether prejudice must be shown, for even if such a showing *is* required, the Court believes that prejudice to Royal is evident on the facts of this case, which have already been discussed in connection with the "late notice" issue. By the time West Bend notified Royal concerning the Root–Palazzolo matter, it was too late for Royal to do *anything* to protect its interests. In short, "[t]here was nothing left for the insurer to do but issue a check." *Augat v. Liberty Mutual Insurance Co.,* 410 Mass. 117, 571 N.E.2d 357, 361 (1991).

According to West Bend, the settlement in the underlying litigation (for roughly half of the plaintiff's demand) was a good one because the plaintiff had powerful arguments for West Bend's liability and could support its damages claim. How West Bend knows this is uncertain, since its own investigation and defense of the claim were minimal. Furthermore, West Bend's arguments about the settlement value of the case must be taken with the proverbial grain of salt because West Bend clearly thought that it could pass along the cost of the settlement to Chiaphua's liability carrier. It is no secret that insurance companies and policyholders approach the settlement of third-party claims with very different considerations in mind. Insurance companies rarely, if ever, settle cases for more than they are worth. By contrast, when a policyholder can provide a settlement at little or no cost, it will do so. Circuit Judge Posner's observations in this regard are particularly apt:

Sellers of products do not want to harm their customers. If they do so by accident ... they are eager to make amends, *especially when they can do so at no cost to themselves,* or at least at no cost greater than the possible increase in insurance premiums that impends whenever an insurer has to pay a claim. They do not want to anger valued customers ... by questioning the accuracy or honesty of the claim, or by trying to

shift the fault to the customer, or by failing to pay the claim promptly.

*Charter Oak Fire Insurance Co. v. Color Converting Industries Co.,* 45 F.3d 1170, 1173–74 (7th Cir.1995). Thus, the typical liability policy does not allow the insured to "settle any claim without consulting the insurer, provided only that the settlement was reasonable." *Id.* Rather, it gives control over the settlement process to the insurer by, *inter alia,* prohibiting voluntary payments. As Royal correctly notes in its brief, this control is an important feature of the liability insurance contract. Without it, policyholders would be free to settle third-party claims for more than they are worth, constrained only by the policy limits.

West Bend deprived Royal of its contractual right to control the settlement process by presenting the settlement as a *fait accompli,* after failing for *years* to even alert Royal to the existence of the claim. The Court believes that such a flagrant breach of the voluntary payments clause is inherently prejudicial. *See Augat,* 571 N.E.2d at 361. To saddle Royal with the cost of the settlement, when it was kept in the dark throughout the investigation, defense and settlement of the claim, would be the "antithesis of equity." *Unigard,* 94 Cal.Rptr.2d at 527.

## V. *Timely Notice Is an Implied Condition of Chiaphua's Contractual Agreement to Indemnify West Bend*

During the early 1980's West Bend accepted goods from Chiaphua, including the popper, pursuant to purchase orders drafted by West Bend. While "it is impossible for Chiaphua to determine from West Bend's records the specific purchase order used to purchase the subject popper," the Court is satisfied that the purchase order that has been produced in this litigation is the best available evidence of the parties' agreement with respect to purchase of the popper. *See* Theisen Aff., ¶ 3 & Attachments. The purchase order agreement provides that Chiaphua will "in-

demnify, defend, and hold harmless" West Bend from and against product claims in connection with the popper. *Id.,* Facts, ¶ 37. In contrast with the Royal insurance policy, the purchase order setting forth this indemnification clause does not contain any express provisions concerning notice. Nevertheless, Chiaphua argues that reasonable notice is an implied condition of the agreement, and that by failing to provide such notice, West Bend breached its contract with Chiaphua.

While there is no Wisconsin case law directly on point, this Court is confident in predicting that the Wisconsin Supreme Court, if confronted with the issue directly, would agree with Chiaphua. The Court of Appeals, in *dicta,* has already suggested that the implied duty of good faith and fair dealing could "require[ ] notice [even] when an indemnity agreement does not." *Wisconsin Natural Gas Co. v. Gabe's Construction Co., Inc.,* 220 Wis.2d 14, 582 N.W.2d 118, 121 (1998). Relying upon basic principles of contract law, other courts have found an implied obligation on the part of the indemnitee to provide reasonable notice, even when the contract does not contain a specific notice requirement. *Cochrane Roofing & Metal Co. v. Callahan,* 472 So.2d 1005, 1007 (Ala.1985); *Town of Fairfield v. D'Addario,* 149 Conn. 358, 179 A.2d 826, 828–29 (1962). Notice of some kind is an implied condition of the indemnification contract for the simple reason that the indemnitor cannot defend or indemnify in connection with a claim that it does not know about. As a leading treatise explains:

> Even if the agreement does not make an event a condition, the court may supply a term that does so. Thus, if an obligor's duty cannot be performed without some act by the obligee, *such as giving notice to the obligor,* the court will supply a term making that act a condition of the obligor's duty.

E. Allan Farnsworth, *Contracts* § 8.2 (3rd Ed.1999) (emphasis added); *see also* 15 *Williston on Contracts* § 48:1 (4th

Ed.2000); *D'Addario,* 179 A.2d at 829 ("[W]hen a party to a contract assumes an express obligation to do certain things—in this case, to defend and indemnify the plaintiff, the law implies a corresponding obligation on the other party to allow him all reasonable opportunity to perform."). The duty to provide *prompt* or *reasonable* notice is rooted in the duty of good faith and fair dealing, which in Wisconsin is part of every contract. *Gabe's Construction,* 582 N.W.2d at 121. Fairness requires prompt notice so that an indemnitor may not only respond to a claim, but also protect its interests as the party ultimately paying the bill. When the indemnitee fails to provide reasonable notice, it has breached a condition of the contract and forfeited its right to indemnification. Here, West Bend forfeited its right to indemnification from Chiaphua by waiting nearly eight years to notify Chiaphua concerning the Root–Palazzolo matter. Accordingly, summary judgment will enter in Chiaphua's favor.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. West Bend's motion for summary judgment is DENIED;

2. Chiaphua's and Royal's motion for summary judgment is GRANTED and this case is dismissed with prejudice; and

3. This decision is issued under seal and shall remain sealed, as requested by the parties in the Stipulation and Order they jointly submitted on May 6, 1999.

SO ORDERED,